

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-13-00184-CV

Carlo **BAZAN** and Denise Bazan, Individually and d/b/a Vamp Ultra Lounge & Cafe, LLC,
Appellants

v.

Luis A. **MUÑOZ** Jr.,
Appellee

From the 406th Judicial District Court, Webb County, Texas
Trial Court No. 2011-CVF-000570-D4
Honorable Oscar J. Hale, Jr., Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
            Patricia O. Alvarez, Justice
            Luz Elena D. Chapa, Justice

Delivered and Filed:  August 13, 2014

AFFIRMED

Carlo Bazan and Denise Bazan, who are married, went into business with their long-time

friend, Luis Muñoz. The Bazans and Muñoz opened a restaurant and bar in Laredo, Texas, called

Vamp Ultra Lounge & Café. Two years later, Muñoz sued the Bazans, alleging they had

wrongfully taken money from the business. A jury found in favor of Muñoz on his claims for

breach of contract, breach of fiduciary duty, and fraud by nondisclosure. The jury awarded Muñoz

damages in the amount of $120,000.00. At Muñoz's election, the trial court rendered judgment on

the fraud by nondisclosure claim and ordered that Muñoz recover $120,000.00 in damages from the Bazans.

On appeal, the Bazans argue the evidence was legally insufficient to support the jury's findings in favor of Muñoz. The Bazans also argue the trial court committed various errors during the trial, such as admitting the testimony of Muñoz's expert witness, refusing to instruct the jury on spoliation of evidence, and failing to grant the Bazans' motion for mistrial during voir dire. We affirm.

**THE TRIAL EVIDENCE**

At trial, the Bazans, Muñoz, and several of their employees testified about the events that led to the filing of this action. Their testimony is summarized below.

### Denise Bazan's Testimony

Denise Bazan testified that she, Carlo, and Muñoz decided to go into business operating a restaurant and bar while they were vacationing together in Cancun. It took about a year for them to implement their plan. On September 2, 2009, the Bazans and Muñoz signed a company agreement, which designated Denise as the managing member. Denise, however, delegated the daily operations to Carlo. According to the agreement, the Bazans owned a 50% interest in the business, and Muñoz owned a 50% interest in the business. Initially, Muñoz contributed about $80,000.00 to the business, which was used to buy an existing nightclub. The Bazans contributed about $15,000.00, which was used to remodel the premises.

Denise acknowledged that Muñoz had a high level of trust in her and Carlo. When the business opened, Muñoz gave Denise and Carlo a great deal of control over the funds that Muñoz had deposited in the business's account. Muñoz's trust in the Bazans was the result of his personal relationship with them. Muñoz had been friends with Denise since high school; he had been friends with Carlo even longer. Denise said that, even as adults, she and Muñoz had "a really good

relationship" and "if there was something wrong, [she] always wanted to talk to him because [she] didn't like to have any friction or tension with him." Denise felt an obligation to protect Muñoz's interest in the business as she would have protected her own interest.

The business opened on October 31, 2009. During the first two months, Carlo did not charge a cover charge at the door. However, as the business became popular and drew large crowds, Carlo required patrons to pay a cover charge. Denise did not feel comfortable estimating how much the business collected each month in cover charges. According to Denise, about a month and a half after the business opened, Carlo and Muñoz agreed that they would split any cover charge money "fifty-fifty." Denise never told Muñoz that Carlo was collecting cover charges, and she did not know how Muñoz found out that Carlo was collecting cover charges.

Denise knew the business used a point of sale system. Under this system, each employee was assigned a separate employee code, thereby making a particular employee responsible for a specific transaction. However, Denise was unaware of what cash controls Carlo had in place at the business.

Denise further testified that Muñoz had very little involvement in the day-to-day operations of the business. Over time, however, Muñoz became concerned about the business's finances. One of Muñoz's concerns was that even though the business was packed, it was bouncing checks every month. Muñoz would call the staff and talk to them about the business and the bounced checks. Furthermore, Muñoz was unhappy about the cash management at the business. Carlo and Muñoz had heated discussions over the phone about cash management. Denise's impression was that this occurred about the time the Bazans decided to start getting a salary for the work they had done. The company agreement required all members—Denise, Carlo, and Muñoz—to agree before any member could be paid a salary. Although Muñoz never agreed to it, Carlo and Denise paid themselves a salary from January 2011 to mid-March 2011. Denise justified this decision by

pointing out that she and Carlo had been working at the business for almost a year and they had not paid themselves anything.

On March 4, 2011, Muñoz presented a letter to Carlo asking him to agree to count the business's cash intake each and every night. Carlo would not agree to do so. Emotions ran high between Muñoz and Carlo, and they started arguing. On at least one occasion, Denise saw Carlo and an employee counting cash at her residence. Muñoz instructed the Bazans to stop counting cash at their residence. Denise said she thought that Carlo had complied with Muñoz's request, but then she could not remember if Carlo stopped counting cash at their residence. At some point, the business's accounts were frozen for failure to pay taxes. Thereafter, Muñoz wanted to see all papers, reports, and receipts pertaining to the business. Muñoz went into the business and took a couple of files filled with documents. Muñoz later removed an entire file cabinet from the business.

### Carlo Bazan's Testimony

Carlo testified that he and Denise paid themselves from the business from January 2010 to November 2010. He estimated that the total amount they received was about $60,000.00. This amount was paid out of the business's cover charge money. According to Carlo, Muñoz also received cover charge money during the same time period. No logs or records of these distributions were kept, but Carlo said that he, Denise, and Muñoz agreed to divide the cover charge money. According to Carlo, Muñoz received anywhere between $60,000.00 and $72,000.00 in cover charge money in one year. He further stated that he and Muñoz agreed that Denise and Carlo should be paid a salary by check in January, February, and March 2011.

Carlo acknowledged that he would count the cash taken in by the business, but he did not do this every night. Instead, Carlo would count the cash once or twice for the whole weekend. Sometimes he would take cash home to count, including the cover charge money. Carlo stated he only counted cash at home twice in 2009, but he counted cash at home for all of 2010. On March

4, 2011, Muñoz sent a letter to Carlo and one of the employee-managers, Orestes Castillo, stating that he wanted all the cash from the bar to be counted and balanced out with the register at closing each night. Muñoz further stated in the letter that all checks were to have his signature on them, as well as either Carlo's or Denise's signature, and that all transactions were to have the approval of all parties. Carlo did not sign the letter. Carlo did not comply with Muñoz's request that all the cash be counted each night at closing. Carlo indicated that he was not going to comply with Muñoz's request unless Muñoz was there to count the cash with him.

Carlo admitted there were months when the business was operating but no deposits were made into any of its bank accounts. There were also months when the accounts were frozen for failure to pay taxes. Carlo believed there was money missing from the business, but he estimated it was closer to $15,000.00 or $20,000.00, rather than the $200,000.00 alleged by Muñoz. He explained that many vendors were paid by cash, and those receipts had been misplaced. He acknowledged that when he and Carlo met with an accountant, the accountant told him to stop paying by cash and to pay by check. Carlo testified that the three owners of the business owed each other a duty of loyalty. Carlo also indicated that the owners were supposed to account to each other for how the money was being spent. Carlo stated that he was the business's handyman. He would use cash to go to Lowe's and buy supplies for work that needed to be done and then he would bring back the receipts. Carlo claimed that some of the receipts were missing and speculated that the missing receipts could have been destroyed by Muñoz.

As to the point of sale system, Carlo indicated that some of the business's employees used only their own assigned code. Carlo acknowledged that sometimes he would use the code assigned to Castillo, an employee-manager, to get money out of the till. Carlo stated that he was unable to open the till unless he rang up a sale. When asked why he did not set up the system so that he could

have the same access as Castillo, Carlo said he did not know how to do that and he did not ask his computer consultant to do it because the computer consultant was not there every day.

### Luis Muñoz's Testimony

Muñoz agreed with Denise's and Carlo's testimony about the formation of the business. Carlo, Denise, and an employee, Hector Chapa, were primarily responsible for running the business. When the business opened, Muñoz had a high level of trust in Carlo. Eventually, Muñoz became dissatisfied with the way the business's cash was being handled. The business was packed and yet its bank accounts were overdrawn. Chapa told Muñoz that Carlo was charging cover charges and was pocketing the cover charge money. Had Chapa not told him, Muñoz would not have known that Carlo was pocketing the cover charge money. When Muñoz confronted Carlo about this, Carlo suggested that they split the cover charge money. Muñoz and Carlo split the cover charge money for about three months. Muñoz said he received about $18,000.00 in cover charge money over the three-month period. However, Muñoz stopped taking the cover charge money when an accountant advised against it. At the time, Carlo told Muñoz that he was also going to stop taking the cover charge money.

According to Muñoz, the point of sale system would show the business was making $60,000.00 to $70,000.00 in a month, and he would look at the business's bank records and see that only $20,000.00 had been deposited. He explained this type of disparity between the point of sale amounts and the amounts deposited in the bank occurred throughout 2010. Muñoz brought this lawsuit to find out where the money had gone. Muñoz added that he had been running the business on his own since May 2011. The business did not have $78,000.00 a month in overhead and no checks had bounced since he took over.

Muñoz admitted that he retrieved a file cabinet from the business because he wanted to find out what was going on with the business. Muñoz initially took the file cabinet to his

accountant's office, but when his accountant was not there, he took it to his house. Muñoz kept the file cabinet at his house for a few weeks, and then took it to his accountant's office. Muñoz denied that he took receipts from the file cabinet or that he destroyed them. Muñoz believed that destroying the business's receipts was not in his best interest from a tax liability standpoint.

### *Employees' Testimony*

Juan Antonio Gonzalez Jr., an employee and a day manager, testified that on several occasions he counted cover charge money from the previous night, but he never deposited this money into the business's accounts. Gonzalez suggested that the cover charge money should be deposited into the business's accounts, but this suggestion was not heeded. Gonzalez delivered cover charge money to the Bazans' residence about four times. On several occasions, Gonzalez deposited the cover charge money into Denise's and Carlo's personal bank accounts.

Orestes Castillo testified that he was responsible for gathering the cash at night and leaving it for Gonzalez to count the next day. Carlo took cash from the business several times. Moreover, every week the business paid its expenses with cash taken from the till. Castillo complained to "the two owners" and to Gonzalez, the manager, that this practice was wrong. When Castillo mentioned to Carlo that the business should not pay its expenses with cash, Carlo responded by stating that Castillo made a "good point."

Hector Chapa testified he was employed as a manager at the business for about six months. According to Chapa, there was a daily cash payout from the point of sale system. Some of the staff and the disc jockeys ("D.J.s") were paid in cash at the end of every night. Chapa did not recall if D.J.s were ever paid out of the cover charge money, but he knew they were paid out of the till. Chapa said he would sometimes need to buy items for the business at the grocery store and he would pay for the items with cash. Chapa stated that the receipts were filed in the filing cabinet in the office on a daily basis. He was responsible for compiling and filing any receipts that he

received. As to the point of sale system, Chapa said the system's entries did not necessarily reflect the person who made the transaction. Chapa confirmed that the employees' codes were not kept confidential. Chapa testified that he had a conversation with Muñoz about Carlo taking quite a bit of cash from the business.

### SUFFICIENCY OF THE EVIDENCE—FRAUD BY NONDISCLOSURE

In their third issue, the Bazans argue the evidence was legally insufficient to support the jury's finding that they committed fraud by nondisclosure.

In reviewing a legal sufficiency or "no evidence" challenge to a jury's finding, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002). The final test for legal sufficiency is whether the evidence would enable fair-minded people to reach the finding under review. *City of Keller*, 168 S.W.3d at 827.

As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). The existence of a duty to disclose is a question of law. *Id*. "Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998); *but see Bradford*, 48 S.W.3d at 755 (acknowledging that several Texas appellate courts have held that a general duty to disclose may arise in an arm's-length

business transaction when a party makes a partial disclosure that, although true, conveys a false impression).

Texas courts recognize two types of fiduciary relationships, formal and informal. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992). In formal fiduciary relationships, such as attorney-client, partnership, and trustee relationships, fiduciary duties arise as a matter of law. *Morris*, 981 S.W.2d at 674. "Outside of the cases in which formal fiduciary duties arise as a matter of law, confidential relationships may arise when the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest." *Id*. Such informal fiduciary relationships may arise when one person trusts and relies upon another, whether the relationship is moral, social, domestic, or merely personal. *Navistar*, 823 S.W.2d at 594. "Because not every relationship involving a high degree of trust and confidence rises to the stature of a formal fiduciary relationship, the law recognizes the existence of confidential relationships in those cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Id*. (internal quotations omitted). The existence of a confidential relationship is usually a question of fact. *Id*.

On appeal, the Bazans argue there was no evidence that they had a duty to disclose because they had neither a formal nor an informal fiduciary relationship with Muñoz. While Texas courts have not recognized a formal fiduciary relationship between majority and minority shareholders in a closely-held corporation, they have recognized that—in the same manner that business partners owe each other and their partnership a fiduciary duty—the nature of the relationships between shareholders in a limited liability company sometimes gives rise to an informal fiduciary relationship between them. *Vejara v. Levior Int'l, LLC*, No. 04-11-00595-CV, 2012 WL 5354681, at *4 (Tex. App.—San Antonio 2012, pet. denied).

Here, the jury found that a relationship of trust and confidence existed between Muñoz and the Bazans. Thus, the jury found the parties had an informal fiduciary relationship. The evidence showed that Muñoz and Carlo had become friends when Carlo was in the eighth grade and Muñoz was in the seventh grade. Carlo testified that he and Muñoz were "really close;" they were running buddies, they socialized together, and they would visit one others' homes. They had remained friends for more than fifteen years. Muñoz and Denise had been friends since high school. When Carlo and Denise were dating, she and Muñoz talked all the time. Furthermore, as adults, the Bazans and Muñoz continued to socialize together extensively. In fact, they decided to open the business while they were vacationing together in Cancun. After deciding to go into business together, the Bazans and Muñoz consulted a single attorney who drafted the company agreement. The Bazans and Muñoz decided that Denise would be the managing member. Muñoz, who was investing about $80,000.00 in the business, would not be involved in the day-to-day operations or even have a manager's role. As Denise acknowledged in her testimony, the reason Muñoz went into business with her and Carlo was because of his personal relationship with them. According to Denise, Muñoz gave her and Carlo a great deal of control over his money because he trusted them. Denise further testified that she and Carlo had an obligation to protect Muñoz's financial interests in the business as they would protect their own financial interests. Moreover, Carlo testified that he and Denise owed Muñoz a duty of loyalty. Based on this record, we conclude there was more than a scintilla of evidence to support the jury's finding that the Bazans and Muñoz had an informal fiduciary relationship. And, in light of the jury's finding that an informal fiduciary relationship existed between the Bazans and Muñoz, the Bazans had a duty to disclose material information to Muñoz. *See Bradford*, 48 S.W.3d at 755; *Morris*, 981 S.W.2d at 674.

The Bazans contend that this case is similar to *Meyer v. Cathey*, 167 S.W.3d 327 (Tex. 2005), where the Texas Supreme Court held that the evidence was legally insufficient to show the

existence of a fiduciary or confidential relationship between the parties. We disagree. In *Cathey*, there was no evidence of a preexisting, personal relationship between the parties. *Id*. at 331. Although the parties in *Cathey* had worked together on earlier projects, the earlier projects were arms-length transactions and the agreements governing these earlier projects expressly disavowed the creation of any fiduciary duties or other special relationships. Thus, the Texas Supreme Court declined to impose a fiduciary duty based solely on the fact that the parties had become friends during the course of their business relationship and frequently dined together. *Id*. Here, by contrast, the parties' close personal relationship spanned two decades and preceded the parties' decision to go into business together. Furthermore, the company agreement in this case, unlike the agreement in *Cathey*, did not expressly disavow the formation of fiduciary duties. *See id*. Finally, even Denise and Carlo acknowledged in their testimony that they owed Muñoz a duty of loyalty and were obligated to protect Muñoz's financial interests in the business as they would protect their own financial interests.

The Bazans also challenge the legal sufficiency of the evidence as to other elements of fraud by nondisclosure. The elements of fraud by nondisclosure are: (1) the defendant concealed from or failed to disclose certain facts to the plaintiff; (2) the defendant had a duty to disclose the facts to the plaintiff; (3) the facts were material; (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (5) the defendant was deliberately silent when he had a duty to speak; (6) by failing to disclose the facts the defendant induced the plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the defendant's nondisclosure; and (8) the plaintiff was injured as a result of acting without the undisclosed facts. *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied); *see Bradford*, 48 S.W.3d at 754-55. In challenging the other elements of fraud by nondisclosure, the Bazans argue "there was no evidence that [they] concealed information

regarding how Vamp would be managed at the time" the initial management discussions took place. The Bazans further argue "there was no evidence [] that [they] failed to disclose a material fact within their knowledge that would constitute fraud, that [they] knew [Muñoz] was ignorant of the fact and did not have an opportunity to discover the truth, that [they] intended to induce [Muñoz] to take some action by failing to disclose the fact, and that [Muñoz] suffered injury as a result of acting without knowledge of the undisclosed fact."

Notwithstanding these arguments, there was ample evidence to support the jury's finding that the Bazans committed fraud by nondisclosure. At trial, Muñoz contended the Bazans committed fraud by nondisclosure by secretly taking money from the business. The company agreement, which was admitted as evidence at trial, provided that any distributions of the business's monies would be made on a quarterly basis and in proportion to each member's share ratio. Nevertheless, there was evidence at trial showing that the Bazans caused the business's money, in particular the cash collected as cover charge money, to be distributed to them without making distributions to Muñoz. The company agreement also provided that members would be paid salaries only if all members were in agreement. Nevertheless, there was evidence at trial showing the Bazans paid themselves salaries without obtaining Muñoz's agreement. There was also evidence showing that Muñoz, who was not involved in the day-to-day operations of the business, did not have an opportunity to discover the truth and suffered injury because funds were secretly taken from the business and were not distributed to him. After reviewing the evidence in the light most favorable to the jury's finding, we conclude a reasonable and fair-minded jury could conclude that Muñoz had proven the elements of fraud by nondisclosure.

Having determined that the evidence was legally sufficient to support the jury's finding that the Bazans had committed fraud by nondisclosure, we need not address the Bazans'

complaints regarding the jury's findings on Muñoz's alternative claims for breach of contract and breach of fiduciary duty.

## WAIVER DEFENSE

In their fifth issue, the Bazans argue the jury erred in failing to find waiver by Muñoz. In conjunction with its finding that the Bazans committed fraud by nondisclosure, the jury found that Muñoz did not engage in waiver. The jury was instructed that waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Because the Bazans are challenging the jury's adverse finding on an affirmative defense, they must show that they conclusively established all vital facts in support of this defense. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with that right. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). At trial, Carlo testified that he had no idea how Muñoz had engaged in waiver. Denise testified that Muñoz had engaged in waiver by his lack of interest in the business and its day-to-day operations. On the other hand, Muñoz testified about his efforts to gain control over the business's finances. Based on all of the evidence presented, the jury was free to find that Muñoz did not engage in waiver. We conclude that the Bazans did not conclusively establish all vital facts in support of waiver.

## EXPERT TESTIMONY AND REPORT

In their sixth issue, the Bazans argue the trial court abused its discretion by admitting the testimony and report of Muñoz's expert witness, Pete Saenz. Saenz, an accountant, determined the amounts of money that were missing from the business in 2010 and 2011. The Bazans moved to strike Saenz's testimony and his report, arguing they were neither relevant nor reliable because

Saenz failed to employ a proper accounting methodology. The trial court allowed Saenz to testify and his report was admitted into evidence. On appeal, the Bazans argue Saenz's testimony was unreliable because "there was just too big of an analytical gap between the relevant information, the various accounting methodologies, and Saenz's opinion and his summary chart."

The decision to admit expert testimony rests within the discretion of the trial court. *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). Rule 702 of the Texas Rules of Evidence provides that a witness who qualifies as an expert because of knowledge, skill, experience, training, or education may testify, provided that the scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. TEX. R. EVID. 702. A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified and (2) the testimony must be relevant and based on a reliable foundation. *Helena Chem. Co v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). The trial court's role is not to determine the truth or falsity of the expert's opinion; instead, its role is to determine whether the expert's opinion is relevant and whether the methods and research upon which it is based are reliable. *Robinson*, 923 S.W.2d at 558. To gauge reliability, the trial court must ensure that the expert's opinion comports with applicable professional standards outside the courtroom and that it has a reliable basis in the knowledge and experience of the discipline. *Wilkins*, 47 S.W.3d at 499. A trial court may conclude there is simply too great of an "analytical gap" between the data and the expert's opinion, thereby rendering the expert's testimony unreliable. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726-27 (Tex. 1998).

Here, Saenz testified at the pretrial hearing that he applied tax accounting rules, rather than general accepted accounting principles ("GAAP") rules, in creating a "missing money" spreadsheet. Saenz explained that he viewed this case from the standpoint of "how are we going to prove to the IRS that we actually had all of these expenses." He further explained that another

reason he wanted to see receipts before giving credit for an expense was because Vamp's point of sale system was lax. Because there was no integrity in the point of sale system, Saenz could not ask an employee about whether he had in fact used the payout to purchase something for the business. Saenz stated, "I am not excluding the [point of sale] cash payouts because I am saying that they are not ordinary and necessary business expenditures incurred as part of Vamp's revenue generating activities. Rather, I am saying that they are not verified because there are no receipts and no vouching employee for those cash expenditures.…" Saenz also stated that in his expertise and experience with the Internal Revenue Service ("IRS"), a third-party receipt was the best proof of a business expense.

The Bazans' accounting expert, James Christopher Morgan, took issue with Saenz's methodology. Morgan opined that Saenz was applying IRS rules too strictly, particularly because it was not a tax situation. Morgan further pointed out that even IRS rules do not state that you need a third-party receipt to deduct an expense. Morgan felt Saenz was being inconsistent because he was using information entered by employees to record every sale, but he wasn't counting information entered by the same employees indicating cash payouts for expenses absent a third-party receipt. Morgan also felt there were other ways to substantiate an expense besides a third-party receipt. Morgan, for example, criticized Saenz for not including expenses for D.J.s who were obviously employed by the business and paid in cash, but did not provide receipts. According to Morgan, these types of expenses should have been credited when determining the amount of money missing from the business. Morgan estimated that there was far less "missing money" than estimated by Saenz.

The trial court could have reasonably concluded that the methodology employed by Saenz—tax accounting principles—comported with well-established professional standards. Saenz explained that use of this methodology was appropriate under the circumstances of this case,

when there was a dispute about missing funds between owners. In applying this methodology, Saenz relied on the business's bank statements, records, receipts, and point of sale summaries. Under the circumstances presented, the trial court was not required to conclude there was an analytical gap between the data and Saenz's conclusions so as to render his testimony and report unreliable. We conclude the trial court did not abuse its discretion in admitting Saenz's testimony and his report.

## DAMAGES

In their seventh issue, the Bazans complain about the damages awarded in the judgment. First, the Bazans complain that it was error for the trial court to render judgment on the jury's damage award because the evidence was legally insufficient to support the jury's liability findings on each of Muñoz's claims. However, as previously discussed, the evidence was legally sufficient to support the jury's finding that the Bazans committed fraud by nondisclosure. Second, the Bazans complain that the trial court committed various errors in charging the jury on damages. However, none of the alleged errors were presented to the trial court. Preservation of error generally depends on whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007). To preserve charge error for review, a party must "point out distinctly the objectionable matter and the grounds of the objection." TEX. R. CIV. P. 274. At the charge conference, the Bazans did not complain that the proposed jury charge contained any errors with respect to damages. Thus, the Bazans' complaints about the jury charge and damages have not been preserved for our review. We conclude the trial court did not err in rendering judgment on the jury's damage award.

## REMITTITUR

In their eighth issue, the Bazans argue that the trial court erred in not granting their request for a remittitur because the jury's finding of $120,000.00 in damages was grossly excessive and

unjust. We review the trial court's denial of a motion for remittitur for factual sufficiency. *Brookshire Bros., Inc. v. Wagnon*, 979 S.W.2d 343, 354 (Tex. App.—Tyler 1998, pet. denied). We examine all of the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id*.

At trial, Muñoz's expert accounting witness testified that, according to his calculations, about $247,077.78 went missing from the business in 2010, and about $15,047.23 went missing from the business in 2011. In his expert report, the Bazans' expert accounting witness opined that "the amount of money that can be considered missing and possibly should be included in Vamp's profits is $45,220.68." We conclude the jury's finding of $120,000.00 in damages was not so against the great weight and preponderance of the evidence as to be manifestly unjust.

### FAILURE TO INSTRUCT ON SPOLIATION OF EVIDENCE

In their ninth issue, the Bazans argue the trial court abused its discretion by refusing to instruct the jury on spoliation of evidence. The Texas Supreme Court has clarified the standards governing whether an act of spoliation has occurred and the parameters of the trial court's discretion upon a finding of spoliation. *Brookshire Brothers, Ltd. v. Aldridge*, No. 10-0846, 2014 WL 2994435, at *1 (Tex. 2014). Under these standards, the party alleging spoliation first bears the burden of establishing that the nonproducing party had a duty to preserve the evidence. *Id.*, at *7 (citing *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003)). A duty arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that the evidence in his possession and control will be material and relevant to that claim. *Id*. Next, the party seeking a remedy for spoliation must demonstrate that the other party breached its duty to preserve material and relevant evidence. *Id*.

Here, the trial court could have reasonably concluded that the Bazans did not meet their burden to establish both that Muñoz had a duty to preserve the evidence and that he breached this duty. At the charge conference, Muñoz argued the trial court should deny the Bazans' request for a spoliation instruction because there was no evidence that Muñoz had destroyed any evidence. At trial, Muñoz testified that he removed files and the file cabinet from the business and took them to an accountant, but he expressly denied that he destroyed any files or receipts. Muñoz also testified that he believed the destruction of the business's receipts was not in his best interest from a tax liability standpoint. The Bazans presented no evidence showing that Muñoz had destroyed any files or receipts. Furthermore, as the trial court observed, a duty arises when a party knows that the evidence may be crucial evidence in a potential lawsuit. In this case, the files and file cabinet were removed from the business long before Muñoz filed the underlying action. Based on this record, we conclude the trial court did not abuse its discretion by refusing to instruct the jury on spoliation of evidence.

### MOTION FOR MISTRIAL

In their first issue, the Bazans argue the trial court erred in denying their motion for mistrial. During voir dire, the Bazans objected and moved for a mistrial, complaining that Muñoz's counsel had asked an improper question. According to the Bazans, the question was improper because it sought to gauge the weight the jury panel would place on specific evidence. The trial court indicated it was not sure if the question was improper, but nevertheless instructed the jury panel to wait until it heard the evidence before making a decision in the case. The trial court then denied the motion for mistrial.

We will not disturb a ruling denying a motion for mistrial absent a showing of an abuse of discretion. *Van Allen v. Blackledge*, 35 S.W.3d 61, 63 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Here, even if we were to assume that the Bazans were correct in asserting that the

question was improper, the Bazans do not explain how the trial court's instruction did not cure any possible error. *See Living Centers of Texas, Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008) (recognizing that an instruction usually cures harm associated with improper jury argument); *Twin City Fire Ins. Co. v. King*, 510 S.W.2d 370, 373 (Tex. Civ. App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.) (concluding improper comment made during voir dire was cured by an instruction to disregard); *Texas Emp. Ins. Ass'n v. Kennedy*, 303 S.W.2d 440, 442 (Tex. Civ. App.—San Antonio 1957, writ ref'd n.r.e.) (concluding complaints about improper voir dire examination were curable by instruction). We conclude the Bazans have failed to show that the denial of their motion for mistrial was an abuse of discretion.

## CONCLUSION

The trial court's judgment is affirmed.

Karen Angelini, Justice