

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-20-00304-CV

**1776 ENERGY PARTNERS, LLC** and 1776 Energy Operators, LLC,
Appellants/Cross-Appellees

v.

**MARATHON OIL EF, LLC** and Marathon Oil EF II, LLC,
Appellees/Cross-Appellants

From the 218th Judicial District Court, Karnes County, Texas
Trial Court No. 17-02-00033-CVK
Honorable Russell Wilson, Judge Presiding

Opinion by:     Beth Watkins, Justice

Sitting:     Beth Watkins, Justice
            Liza A. Rodriguez, Justice
            Lori I. Valenzuela, Justice

Delivered and Filed: March 29, 2023

AFFIRMED IN PART; REVERSED AND RENDERED IN PART AND REMANDED IN
PART

Appellants/cross-appellees 1776 Energy Partners, LLC and 1776 Energy Operators, LLC

(collectively, 1776) challenge a final judgment following a summary judgment and a jury trial.

Appellees/cross-appellants Marathon Oil EF, LLC and Marathon Oil EF II, LLC (collectively,

Marathon) challenge the portion of the judgment rendering a declaratory judgment in 1776's favor

and awarding attorney's fees to 1776. We reverse the declaratory judgment in 1776's favor, render

judgment dismissing the claim underlying that declaratory judgment, and remand the cause for

further proceedings on 1776's claim for attorney's fees. We affirm the remainder of the trial court's judgment.

## BACKGROUND

Marathon and 1776 are parties to several joint operating agreements (JOAs) under which they share expenses and revenues from wells drilled in areas in which they both hold ownership interests. A JOA is a contract that, inter alia, defines the area to which the contract applies, identifies the parties' proportionate ownership of the contract area, explains the parties' rights and obligations, and establishes procedures to be followed if a party defaults on its obligations. Each party's share of the expenses and revenues is typically determined by its proportionate ownership interest in the well.

Each JOA in this case designates an operator for wells drilled under that contract. The operator conducts the drilling and other operations at the well site, including the sale of any oil or gas produced. The operator recoups those costs by sending joint interest billing invoices (JIBs) to participating non-operator working interest owners. The participating non-operator working interest owners are obligated to pay the JIBs sent by the operator, and the operator is obligated to pay revenues owed to the participating non-operator working interest owners. Either an operator or a non-operator working interest owner may propose new wells in the contract area, and the JOAs establish procedures that control the proposal of and participation in a new well.

Three JOAs between 1776 and Marathon are relevant to this appeal: (1) the Culberson Hughes JOA; (2) the "Longhorn" JOAs, which cover three separate pooled units; and (3) the Bordovsky JOA. The Culberson Hughes and Longhorn JOAs designate Marathon as the operator and 1776 as a non-operator working interest owner. The Bordovsky JOA designates 1776 as the operator and Marathon as a non-operator working interest owner. This means that for wells drilled under the Culberson Hughes and Longhorn JOAs, 1776 is required to reimburse Marathon for

1776's share of the cost of the wells and, in turn, Marathon is required to pay 1776 the revenue 1776 is entitled to from those wells. In contrast, for wells drilled under the Bordovsky JOA, 1776 is responsible for ensuring Marathon timely receives revenue that it is owed, and Marathon must timely pay its share of costs associated with the wells.

In 2012, a Zavala County trial court imposed a constructive trust on 1776's assets in a lawsuit that is unconnected to this case. As a result of the constructive trust, 1776 began to suffer cash flow problems. Between April and September of 2014, 1776 failed to pay Marathon more than $2 million in revenue from the Bordovsky wells. 1776 initially held the money in suspense due to a title issue, but by the time that issue was resolved, 1776 had spent the money on other bills. In February of 2015, 1776 stopped paying its share of expenses under the Culberson Hughes JOA because it did not have the money. At that time, there was only one well drilled under the Culberson Hughes JOA, which was called the 301H well. 1776 also stopped paying its share of expenses under the Longhorn JOAs.

For approximately two years, Marathon tried to resolve 1776's unpaid amounts. However, in August of 2016, Marathon received information that it believed showed 1776 was planning to drill a new well. Marathon questioned how 1776 could fund a new well when it still owed Marathon millions of dollars on wells that already existed. 1776 responded that the new well would be funded by a separate company. Following this dispute, the parties' relationship deteriorated.

At some point, Marathon began to use a process called "netting" to recoup 1776's outstanding debts. Netting is using revenue owed to a party to pay down that party's debts. The parties agree that Marathon was permitted to net within the Culberson Hughes JOA; in other words, it is undisputed that Marathon could properly take revenue it would have otherwise paid to 1776 under the Culberson Hughes 301H well and apply that revenue to JIBs 1776 failed to pay under that same JOA. The parties disagree about whether the JOAs permitted Marathon to "cross-net,"

or apply revenue owed to 1776 under one JOA to debts 1776 owed under another JOA. Marathon engaged in both netting and cross-netting throughout the time relevant to this appeal.

On October 28, 2016, Marathon sent 1776 and the other working interest owners in the Culberson Hughes JOA authorizations for expenditure (AFEs) proposing three new wells in the Culberson Hughes contract area. Those wells were designated as the 2H, 3H, and 4H wells. As permitted by the JOA, Marathon's AFEs included a "cash call" indicating the working interest owners would need to pay their proportionate shares of the drilling and completion costs upfront to participate in these wells. When Marathon issued the AFEs, 1776 owned approximately 64% of the working interest in the Culberson Hughes contract area, and Marathon owned approximately 20% of the working interest.

The AFEs indicated that 1776's share of the drilling and completion costs would be $9.4 million. Under the terms of the JOA, 1776 had thirty days to elect whether to participate in the new wells. If it elected to participate, the JOA required it to pay the cash call within fifteen days of the date of election. If 1776 elected not to participate, or if it elected to participate but failed to timely pay the cash call, the JOA provided for it to be deemed "non-consent" in the wells. If 1776 were deemed non-consent, the JOA allowed the other working interest owners to acquire 1776's interest in the new wells until the new wells reach "payout."

On November 23, 2016, 1776 elected to participate in the new wells, so the JOA required it to pay the cash call by December 12, 2016. 1776 told Marathon it would "forward the cash call portion of the drilling costs for the three (3) wells as provided for" in the JOA, and it asked Marathon to notify 1776 "when Marathon stimulates the wells, so 1776 can forward it's [*sic*] portion of the completion costs for each well."

But 1776 did not have the money to pay the cash call, so throughout mid-December of 2016, it negotiated with outside funders to raise the money. Contemporaneously, it also presented

three separate funding proposals to Marathon. In the first funding proposal, 1776 offered to pay the entire $9.4 million cash call for the new wells.[1] As part of this proposal, 1776 asked Marathon to amend the Culberson Hughes JOA and sign a partial release of lien. The amendment and partial release would have provided that Marathon could only apply the cash call funds to the new wells and could not use that money to pay down 1776's outstanding debts. 1776 identified this amendment as a prerequisite to its outside funders' agreement to provide cash for the proposal. The parties agree that without this amendment, Marathon could properly take any funds 1776 paid under the Culberson Hughes JOA, including the cash call for the new wells, and apply that money to 1776's oldest unpaid debts under the Culberson Hughes JOA. Marathon refused to amend the JOA or to sign the partial release of lien, so the first funding proposal fell apart.

On December 12, 2016, Marathon sent 1776 a notice of default stating:

> To date, Marathon has not received 1776's proportionate share of the estimated costs to drill the [new wells]. As a result, 1776 has defaulted on its obligation, pursuant to [the JOA], to fund its proportionate share of the estimated costs to drill the referenced wells. The JOA states that if such default is not cured by appropriate payment on or before five (5) days after this Notice of Default, then the non-defaulting parties may elect to treat such default in the manner as described in the JOA.

The evidence shows that both 1776 and its outside funders were aware that the December 12 letter gave 1776 five days to cure the default by paying the cash call. In response to the notice of default, a 1776 employee emailed Marathon a picture of a man pulling out empty pants pockets.

In the second funding proposal, 1776 offered to pay the $9.4 million cash call for the new wells, plus what it owed in unpaid JIBs on the Culberson Hughes 301H well. In his December 14,

---

[1] At some point during the AFE process, Marathon decided the non-operator working interest owners could participate in the new wells by paying only the drilling costs upfront instead of both the drilling and completion costs. 1776 Energy Operators's president, Richard Bobigian, testified that Marathon never told 1776 that it could participate by paying only the drilling costs. However, 1776's November 23, 2016 written election to participate in the wells indicated that 1776 intended to pay only the drilling costs until after the wells were stimulated. Additionally, a December 12, 2016 letter from Marathon to 1776 stated that 1776 did not pay its "proportionate share of the estimated costs to drill the" new wells and identified 1776's share of the drilling costs as $1,856,930.52.

2016 email proposing this arrangement to Marathon, 1776 Energy Operators's president, Richard Bobigian, estimated that 1776 owed approximately $1 million on the 301H well. A Marathon employee, Keith Wiles, responded to Bobigian's offer by noting that Marathon's own records showed 1776 owed $1.8 million on the 301H well.[2] Wiles asked Bobigian to confirm that 1776 intended to pay this higher amount. In response to Wiles's request for confirmation, Bobigian told Wiles, "[S]ee if you can make it work on your side, and I will do the same." The evidence shows that Bobigian knew the outside funders may be hesitant to "swallow an added 1.8 million." While Bobigian testified that he later told Wiles over the phone that 1776 would pay the full $1.8 million, Wiles testified that phone call never occurred and that as far as he knew, 1776 never confirmed that it was willing to pay $1.8 million toward the 301H debt. On December 15, 2016, one of 1776's outside funders replied to Bobigian's description of the second funding proposal with an email stating, "We need to think about what a more global Marathon solution might look like and if that's doable from this end." The record does not show that Marathon ever explicitly accepted or rejected the second funding proposal.

On December 16, 2016, Bobigian asked Marathon's Wiles to "call [Bobigian] as soon as possible" so the two could discuss "craft[ing] a global settlement with Marathon." The global settlement that 1776 presented was an offer to pay its entire existing debt to Marathon, plus the drilling and completion costs of the three new wells. Also on December 16, Marathon agreed to extend 1776's cash call deadline until the close of business on December 22, 2016. In his email accepting the extension, Bobigian stated that Marathon's description of the amounts 1776 owed "are consistent with the scope of our understanding of the indebtedness to Marathon." Bobigian

---

[2] The $1.8 million 1776 owed on the 301H well is separate from the $1,856,930.52 Marathon estimated as 1776's share of the drilling costs for the 2H, 3H, and 4H wells.

testified that this third funding proposal did not come to fruition because 1776 and its outside funders did not reach an agreement on terms.

On December 23, 2016, Bobigian sent Marathon an email thanking it for the extension and stating that 1776 "was not able to complete the financing arrangements. The closing and funding fell apart because the new money couldn't get comfortable with the notion that Marathon could apply the $9.5 million cash call to aged receivables." Bobigian also noted that "1776 and the new money source could not reach terms on the additional funding." It is undisputed that 1776 never paid the cash call for the Culberson Hughes 2H, 3H, and 4H wells.

On January 9, 2017, Marathon sent 1776 a letter that formally deemed 1776 non-consent in the 2H, 3H, and 4H wells for failure to pay the cash call. Marathon and the other working interest owners subsequently split 1776's 64% proportionate share of the wells, as permitted by the JOA. This increased Marathon's ownership interest in the new wells from approximately 20% to approximately 55%.

On January 18, 2017, representatives of 1776 and Marathon met at Marathon's office. During that meeting, 1776 asked for additional time to gather funding so it could be "let back into" the new wells. Marathon responded that it could not grant 1776's request because the election period had ended and "we had offered up that non-consenting interest of 1776 to the other participating parties." After the meeting, 1776 sent Marathon a demand letter alleging that Marathon had prevented 1776 from paying the cash call. The letter stated, "But for Marathon's false claim and statement [that it could apply the cash call payment to amounts owed outside the Culberson Hughes JOA], 1776's sale would have closed, funding of the AFEs for the New Wells would have been timely tendered, and the 301H debt paid in full."

On February 16, 2017, Marathon sued 1776. Marathon sought a declaration that 1776's "failure to make timely advance payment for drilling costs in connection with the Culberson

Hughes [2H, 3H, and 4H] wells deems 1776 Energy Partners non-consent to the proposed operation to drill those three wells." Marathon also alleged that 1776 had breached the Culberson Hughes and Longhorn JOAs by failing to pay drilling and operation expenses and had breached the Bordovsky JOA by failing to make timely revenue payments.

On July 17, 2017, 1776 filed a counterclaim for breach of contract and declaratory judgment. 1776 conceded that it owed money to Marathon and was in default under the terms of the various JOAs. It alleged, however, that Marathon's refusal to assure 1776's outside funders that it would not cross-net the new wells' cash call against 1776's old debts "was a repudiation and anticipatory breach of the Culberson-Hughes JOA." These counterclaims appear to arise solely out of the failure of the second funding proposal. 1776 also sought declarations that: (1) "the Culberson Hughes JOA does not require payment of existing obligations under separate JOAs to participate in the drilling of the Culberson Hughes 2H, 3H, and 4H"; (2) "the $9,413,862.00 paid by [1776] must be applied to only the estimated gross drilling costs for the Culberson Hughes 2H, 3H, and 4H"; and (3) "after [1776] pays the $9,413,862 estimated gross drilling costs for the Culberson Hughes 2H, 3H, and 4H its working interest must be reinstated without reduction or offset." 1776's original, first amended, and second amended counterclaims did not specifically allege that cross-netting itself constituted an actionable breach of the JOA.

Marathon filed a motion for summary judgment on its breach of contract claim and 1776's counterclaims. Marathon's motion alleged that at that time, 1776 owed Marathon "approximately $838,000 in unpaid costs and interest" under the Culberson Hughes and Longhorn JOAs and "over $2.5 million in unpaid revenues and interest for the Bordovsky" wells. Marathon attached documentary evidence supporting these amounts. Marathon also argued that it was entitled to judgment on 1776's counterclaims.

After Marathon sought summary judgment, 1776 amended its counterclaim to allege fraud by nondisclosure. 1776 based this claim on an allegation that Marathon proposed the 2H, 3H, and 4H wells as a ploy to take over 1776's interest in those wells. As evidence of this claim, 1776 pointed to what it called a "smoking gun" email from Marathon employee Matt Brown that explained multiple options the JOA permitted Marathon to take after it proposed the new wells. 1776 also alleged that the AFEs identified a drilling date that was a month or more before Marathon planned to actually begin drilling. 1776 alleged this purportedly inaccurate date showed that Marathon rushed the AFE process to exclude 1776 from participating in the new wells. Marathon then filed a supplement to its motion for summary judgment that challenged 1776's fraud claim.

1776 argued Marathon was not entitled to summary judgment on either Marathon's claims or 1776's counterclaims. It claimed the evidence showed Marathon anticipatorily breached and repudiated the Culberson Hughes JOA "by demanding 1776 pay the entire amount past due on all wells in addition to capital costs for the new Culberson-Hughes wells." 1776 argued that the second funding proposal did not require Marathon to amend the Culberson Hughes JOA or release any of its rights under that contract, but merely required Marathon to "provide reasonable assurances that Marathon would abide by the terms of the Culberson-Hughes JOA." 1776 argued that but for Marathon's alleged repudiation, "1776 would have been entitled to the revenue and proceeds of the" new wells.

On May 3, 2018, the trial court signed an order granting Marathon's motion for summary judgment in part. The trial court concluded that 1776 breached the Bordovsky JOA by failing to pay revenues to Marathon and breached the Culberson Hughes and Longhorn JOAs by failing to pay JIBs. The trial court rendered judgment against 1776 for $1,963,800.06 in principal and $563,001.24 in interest under the Bordovsky JOA and $838,123.28 in principal and interest under the Culberson Hughes and Longhorn JOAs. The award included credits to 1776 for revenue

withheld by Marathon. The trial court also rendered declaratory judgments for Marathon on certain issues "without considering 1776's counter claims," reserved Marathon's claim for attorney's fees to be determined later, and noted, "In all other respects Marathon's Motion for Summary Judgment is denied."

Both before and after the trial court granted partial summary judgment for Marathon, the parties engaged in extensive discovery disputes. Marathon sought to exclude the trial testimony of three of 1776's expert witnesses because it contended that 1776's expert disclosures were inadequate. On March 27, 2018, the trial court ordered 1776 to file adequate expert designations within fourteen days. The court's order provided that if 1776 failed to do so, the court would exclude three of 1776's expert witnesses—Allen Cummings, Rex Morris, and Bobigian—from testifying at trial. While 1776 amended its expert disclosures following this order, Marathon argued the disclosures were still inadequate because "1776 has failed to describe any of its experts' opinions and the basis for those opinions." The trial court denied Marathon's motion to exclude as to Cummings, granted the motion as to Morris, and granted the motion as to Bobigian's testimony on future damages.

On October 8, 2018, 1776 sought leave to add a new breach of contract claim, which would have alleged for the first time that cross-netting breached the JOAs. It also attempted to allege for the first time that Marathon had converted 1776's property "by improperly netting" revenues owed to 1776 against debts owed by 1776, and it sought to add a third-party defendant. Marathon responded that the pleading deadline had already passed, that the new claims 1776 sought to add "could have been brought timely," and that the amended pleading was prejudicial on its face. The trial court denied 1776's motion for leave to amend.

On November 6, 2018, 1776 filed a "Motion to Supplement and Reconsider Initial Grant of Summary Judgment in Marathon's Favor in Light of New Evidence." 1776 argued that it had

"uncovered new evidence casting doubt on Marathon's damages for the alleged breaches of the Longhorn JOAs." The evidence upon which 1776 relied was deposition testimony from Marathon's corporate representatives regarding cross-netting. The trial court denied 1776's motion.

The parties tried this case to a jury in April of 2019. While the trial court had already granted summary judgment on Marathon's breach of contract damages, Marathon presented updated evidence of its damages at trial. This evidence showed how the amounts 1776 owed had changed due to the netting and cross-netting Marathon engaged in between the summary judgment and the jury trial.

After both parties rested and closed, the trial court granted Marathon a directed verdict on 1776's fraud by nondisclosure claim, stating:

> I don't find that there's any evidence that Marathon did anything that it didn't have a legal right to do under the contract. It may have let 1776 sweat about whether it was going to do something else, but it had the right to move the [drilling] dates around. I think it had the absolute right to propose those wells for whatever reason it wanted to propose them for.

The trial court also directed a verdict in 1776's favor on its request for a declaration that the Culberson Hughes JOA did not require 1776 to pay existing obligations under other JOAs to participate in the 2H, 3H, and 4H wells. The parties then asked the jury to determine:

- whether 1776 had reasonable grounds to believe Marathon would commit a material breach of the Culberson Hughes JOA on December 15–16, 2016 and, if so, whether Marathon failed to provide reasonable assurances;

- whether Marathon communicated to 1776 that it was repudiating the Culberson Hughes JOA without just excuse and, if so, when that communication occurred;

- whether 1776's failure to comply with the Culberson Hughes JOA was a material breach and, if so, when that breach occurred;

- what sum of money would reasonably compensate 1776 for Marathon's failure, if any, to comply with the Culberson Hughes JOA; and

- the reasonable and necessary fees for both sides' attorneys.

Importantly, the parties did not submit a question to the jury on the amount of Marathon's breach of contract damages. 1776 objected that such a submission was necessary because the evidence on Marathon's damages was not conclusive. 1776 also objected that the charge should have instructed the jury that the trial court had granted directed verdict on one of 1776's requests for declaratory judgment.

The jury found that 1776 did not have reasonable grounds to believe Marathon would commit a material breach of the Culberson Hughes JOA and that Marathon did not communicate to 1776 that it was repudiating the Culberson Hughes JOA without just excuse. Because the jury answered "no" to these questions, it did not answer the question regarding 1776's damages. It also found that 1776's failure to comply with the Culberson Hughes JOA was a material breach that occurred on January 1, 2015. Finally, the jury made findings on both sides' reasonable and necessary attorney's fees.

On March 6, 2020, the trial court signed a final judgment that was consistent with the summary judgment, the directed verdicts, and the jury's verdict. On Marathon's breach of contract claims, the court rendered judgment for Marathon in the amount of $2,297,731.66 "[b]ased on the May 3, 2018 [Summary Judgment] Order and the evidence presented at trial." This amount accounted for principal and interest Marathon was still owed under the Bordovsky JOA, as well as credits Marathon had shown 1776 was owed under the Culberson Hughes and Longhorn JOAs. The trial court also included an "alternative judgment to Marathon" to be awarded "[i]f, on appeal, it should be determined that" Marathon's damages were fully resolved as of the May 3, 2018 summary judgment. The "alternative" judgment awarded Marathon $3,603,853.88, a sum that consisted of the amounts listed in the May 3, 2018 summary judgment order, plus interest that had

accrued on the Bordovsky debt since the summary judgment, but without any credits Marathon had applied since the summary judgment. The trial court awarded attorney's fees to both parties.

On March 31, 2020, 1776 filed a motion to modify the judgment or, in the alternative, for new trial. After that motion was denied by operation of law, 1776 timely filed a notice of appeal, and Marathon filed a cross-appeal.

## ANALYSIS

### *Appellate Jurisdiction*

In its seventh issue, 1776 briefly argues that because the trial court's judgment "offers two alternative amounts of damages" to Marathon, the judgment "cannot be deemed 'final.'" The judgment recites, "This Final Judgment disposes of all claims between the parties. This is the final, appealable judgment in this case." We conclude this judgment is final and appealable. *See, e.g.*, *In re Elizondo*, 544 S.W.3d 824, 828–29 (Tex. 2018) (orig. proceeding) (per curiam) (holding that unequivocal "finality phrases" must be taken "at face value"). We therefore turn to the merits of this case.

### *The Declaratory Judgment in 1776's Favor*

In its cross-appeal, Marathon argues the trial court erred by rendering a declaratory judgment in 1776's favor. Because our resolution of this question is dispositive of 1776's fifth issue regarding a proposed jury instruction on the declaratory judgment, we address Marathon's cross-appeal and 1776's fifth issue together.

### *Standard of Review and Applicable Law*

The Uniform Declaratory Judgments Act provides:

> A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument . . . and obtain a declaration of rights, status, or other legal relations thereunder.

TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a). Under the UDJA, a court "may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009.

"A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995); *Hous. Chronicle Publ'g Co. v. Thomas*, 196 S.W.3d 396, 401 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Texas courts lack jurisdiction to render advisory opinions that do not resolve a live controversy. *Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000) (per curiam). "To constitute a justiciable controversy, there must exist a real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute." *Bonham*, 907 S.W.2d at 467 (internal quotation marks omitted). Because a UDJA claim that seeks a declaration of "'what the law would be on a hypothetical set of facts'" is not ripe for adjudication, a trial court lacks subject matter jurisdiction to render such a declaration. *See Robinson v. Parker*, 353 S.W.3d 753, 755–56 (Tex. 2011) (quoting *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 444 (Tex. 1998)). "We review questions of subject matter jurisdiction de novo." *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 682 (Tex. 2020).

### *Application*

The declaratory judgment at issue provides:

> The Culberson-Hughes JOA does not require payment of existing obligations under separate JOAs to participate in the drilling of the Culberson-Hughes 2H, 3H, and 4H wells.

While this declaration construes a written contract, *see* TEX. CIV. PRAC. & REM. CODE § 37.004(a), Marathon contends it resolves a hypothetical situation rather than a live controversy.

We agree. Even if the Culberson Hughes JOA did not require 1776 to pay non-Culberson Hughes debts to participate in the new wells, it is undisputed that the JOA required 1776 to pay the cash call and that 1776 never did so. Because 1776 never paid the required cash call, the trial court's declaration about whether Marathon could impose additional obligations on 1776's participation in the wells resolved a hypothetical situation that would not have determined the dispute between these parties. *See Hous. Chronicle Publ'g*, 196 S.W.3d at 401 (UDJA claim is not justiciable unless the parties' dispute "will actually be determined by the judicial declaration sought"). The declaration therefore did not resolve a "genuine conflict of tangible interests" between the parties and was an advisory opinion. *See Bonham*, 907 S.W.2d at 467; *Hous. Chronicle Publ'g*, 196 S.W.3d at 401. Because the trial court lacked subject matter jurisdiction to render that advisory declaration, we must reverse it and render judgment dismissing 1776's request for a declaratory judgment on this point.[3] *See Robinson*, 353 S.W.3d at 755–56; *see also Tex. Dep't of Pub. Safety v. Styron*, 226 S.W.3d 576, 579 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (if a trial court lacks subject matter jurisdiction, appellate court must set the judgment aside and dismiss the claim).

In its fifth issue, 1776 argues the trial court erred by refusing to instruct the jury on the declaratory judgment at issue in Marathon's cross-appeal. Because we have concluded the trial court lacked authority to render that declaration, we cannot say the trial court acted arbitrarily, unreasonably, or without reference to guiding rules or principles by refusing to instruct the jury on

---

[3] 1776 argues we should affirm the declaratory judgment because "there was no evidence presented at trial to show that the Culberson Hughes JOA permitted cross-netting" and because Marathon "did not move for directed verdict on the grounds that 1776 Energy's declaratory judgment claims did not involve a 'live controversy.'" But it is well-established that "[s]ubject matter jurisdiction is essential to the authority of a court to decide a case." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). A trial court's subject matter jurisdiction is never presumed; a challenge to subject matter jurisdiction can never be waived and can be raised for the first time on appeal. *See, e.g.*, *Martinez v. Estrada*, 392 S.W.3d 261, 263 (Tex. App.—San Antonio 2012, pet. denied).

it. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009) (we review jury instructions for abuse of discretion). We therefore overrule 1776's fifth issue.

While we have concluded the trial court lacked jurisdiction to consider the discrete UDJA claim Marathon challenges, we disagree with Marathon's assertion that this error requires us to render a take-nothing judgment on 1776's claim for attorney's fees. The UDJA permits a trial court to award fees to both prevailing and non-prevailing parties. *See* TEX. CIV. PRAC. & REM. CODE § 37.009; *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637–38 (Tex. 1996). Here, the trial court considered multiple UDJA claims for which no jurisdictional impediment exists. We therefore remand this cause to the trial court for a determination of whether 1776 was entitled to an award of attorney's fees in connection with the parties' remaining UDJA claims. *See Barshop*, 925 S.W.2d at 637–38.

### 1776's Issues

### Challenges to the Summary Judgment Order

In its first issue, 1776 asserts six challenges to the trial court's May 3, 2018 summary judgment in Marathon's favor.

#### Standard of Review and Applicable Law

This court reviews a summary judgment de novo. *See, e.g.*, *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The trial court granted Marathon a traditional summary judgment on its breach of contract claims, including its claim for breach of contract damages. To be entitled to a traditional summary judgment on its own claim, Marathon was required to conclusively establish all essential elements of that claim. *Compass Bank v. Durant*, 516 S.W.3d 557, 565 (Tex. App.—Fort Worth 2017, pet. denied). The required elements of a breach of contract claim are: "(1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach."

*Brooks v. Excellence Mortg., Ltd.*, 486 S.W.3d 29, 36 (Tex. App.—San Antonio 2015, pet. denied) (internal quotation marks omitted).

*Application*

A.       Did Marathon's motion for summary judgment seek an award of monetary damages?

1776 first contends that the money damages awarded in the summary judgment order should be reversed because "the [summary judgment order] determined liability only, as Marathon did not plead for actual damages in any amount or in their grounds for relief." (emphasis in original). The prayer of Marathon's motion for summary judgment asked the trial court to "determine that 1776 breached the JOA by failing to pay revenues and to pay costs and expenses to Marathon as required" and to "award Marathon all such other and further relief to which it may be entitled." Additionally, the body of the motion identified the amount 1776 owed as what "[t]his case is about," described the unpaid amounts Marathon sought, and cited evidence in support of those amounts. Because Marathon's request for damages was included in the motion itself, the motion was procedurally sufficient to support the summary judgment order. *See* TEX. R. CIV. P. 166a(c); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993).

B.       Was Marathon entitled to summary judgment against both 1776 entities?

In its second challenge to the summary judgment order, 1776 argues Marathon did not show it was entitled to judgment against both 1776 Energy Operators and 1776 Energy Partners. 1776 argues Marathon did not present any evidence showing the two entities agreed to be liable for each other's debts or that the parties to the various JOAs are in privity with each other.

We construe this as a contention that Marathon did not establish that 1776 Energy Operators and 1776 Energy Partners were liable in the capacity in which they were sued. Lack of capacity is an affirmative defense that must be specifically pleaded and verified by affidavit or it is waived. TEX. R. CIV. P. 93; *Werner v. Colwell*, 909 S.W.2d 866, 870 (Tex. 1995). 1776's live

answer described "1776 Energy Partners, LLC and 1776 Energy Operators, LLC" collectively as "'Defendants,'" did not assert that the two entities were legally separate, and did not plead that either or both of them were not liable in the capacity in which Marathon sued them. Furthermore, the record contains multiple documents filed by 1776—including 1776's summary judgment response—in which 1776 affirmatively treated the two entities as one. On this record, we conclude this complaint is not preserved for our review. *See* TEX. R. CIV. P. 93; *Werner*, 909 S.W.2d at 870.

C.  Did the trial court err by considering cross-netted amounts in calculating Marathon's damages?

In its third challenge to the summary judgment order, 1776 argues the trial court erred by considering evidence of cross-netting in the calculation of Marathon's summary judgment damages. 1776 contends that the summary judgment order improperly "appl[ied] revenues Marathon owed to 1776 Energy on separate, distinct JOAs to the debts allegedly owed by 1776 Energy to Marathon." 1776 did not present any evidence to show that Marathon's cross-netting raised a genuine issue of material fact as to the amount of Marathon's damages at the time of the summary judgment proceedings. TEX. R. CIV. P. 166a(c). Similarly, 1776 has not demonstrated that any application of the cross-netted amounts during the summary judgment proceeding resulted in a judgment that ordered 1776 to pay amounts it did not actually owe. As a result, 1776 has not shown that this error, if any, probably resulted in the rendition of an improper judgment. TEX. R. APP. P. 44.1(a).

D.  Should the trial court have refused to consider a declaration Marathon offered in support of its damages?

In its fourth challenge to the summary judgment order, 1776 argues the trial court erred by considering a declaration authored by Marathon employee Mark King. An affidavit supporting a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to

testify to the matters stated therein." TEX. R. CIV. P. 166a(f). Defects in the substance of an affidavit may be raised for the first time on appeal, but defects in the form of an affidavit must be objected to and ruled on in the trial court or they are waived. *See Seim v. Allstate Tex. Lloyds*, 551 S.W.3d 161, 166 (Tex. 2018) (per curiam).

1776 first argues the declaration does not show that King had personal knowledge of the terms of the JOAs or the calculation of Marathon's damages. While 1776 did not raise this argument below, we have noted that "case law from the Texas Supreme Court indicates no objection was required" to preserve an objection to a lack of personal knowledge. *See Porterfield v. Deutsche Bank Nat'l Tr. Co.*, No. 04-20-00151-CV, 2021 WL 4976560, at *11 (Tex. App.—San Antonio Oct. 27, 2021, pet. denied) (mem. op. on reh'g) (citing *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 666 (Tex. 2010)). This argument is therefore preserved for our review. However, "[a]n affiant's assertion of 'personal knowledge may be based on a review of corporate business records.'" *Id.* (quoting *Botello v. MidFirst Bank*, No. 05-19-00461-CV, 2020 WL 3263434, at *3 (Tex. App.—Dallas June 17, 2020, no pet.) (mem. op.)). King's declaration stated that during the relevant time, he was Marathon's Service Manager for Joint Interest Accounting Services and his duties included "overseeing the collection of joint interest receivables, which are the joint interest billings ('JIBs') that Marathon sends to working interest owners in units that Marathon operates." King further stated he was "familiar with the manner in which Marathon maintains these" records and that based on his review of those records, he was "knowledgeable about the amounts that 1776 owes Marathon in unpaid costs and expenses in several wells that Marathon operates," including the wells drilled under the Culberson Hughes and Longhorn JOAs. These assertions were sufficient to show King's personal knowledge. *See id.*

Next, 1776 contends that King's declaration was conclusory. A conclusory affidavit expresses an inference or draws a legal conclusion without providing the underlying supporting

facts. *See Hilderbran v. Tex. Sw. Council, Inc., Boy Scouts of Am.*, No. 04-20-00112-CV, 2021 WL 2211353, at *5 (Tex. App.—San Antonio June 2, 2021, no pet.) (mem. op.). Because a conclusory affidavit is legally no evidence, this complaint asserts a defect in substance that can be raised for the first time on appeal. *See Browne v. City of San Antonio*, No. 04-11-00219-CV, 2012 WL 11756, at *4 (Tex. App.—San Antonio Jan. 4, 2012, pet. denied) (mem. op.). King's declaration explained the method Marathon uses to determine how much money it is owed, identified the time periods for which 1776 failed to make required payments, stated the amounts that 1776 failed to pay, and explained how much of those unpaid amounts had been offset by revenues that accrued to 1776's working interest. Based on this information, the declaration stated a total amount owed. None of the statements in the declaration expressed legal conclusions or unsupported inferences; the declaration consisted solely of factual statements that could, if untrue, have been readily controverted. *See Hilderbran*, 2021 WL 2211353, at *5; *see also La China v. Woodlands Operating Co., L.P.*, 417 S.W.3d 516, 520 (Tex. App.—Houston [14th Dist.] 2013, no pet.). King's declaration therefore was not conclusory.

Finally, 1776 argues King's declaration was defective because it was accompanied by and relied on unauthenticated balance summaries. As support for this assertion, 1776 cites a Texas Supreme Court opinion holding that summaries of voluminous records "are not the best evidence of the underlying records." *Black Lake Pipe Line Co. v. Union Constr. Co., Inc.*, 538 S.W.2d 80, 92–93 (Tex. 1976), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). Failure to assert and obtain a ruling on a best evidence objection in the trial court waives that issue on appeal. *See Chance v. CitiMortgage, Inc.*, 395 S.W.3d 311, 315 (Tex. App.—Dallas 2013, pet. denied). Similarly, a complaint that an affidavit refers to unsworn or unattached materials is a defect of form that must be objected to and ruled on in the trial court to preserve error. *See Seim*, 551 S.W.3d at 162–64; *Kotzur v. Kelly*, 791 S.W.2d 254, 256–57 (Tex. App.—

Corpus Christi–Edinburg 1990, no writ). Because 1776 did not raise any objections to the form of King's declaration below, we decline to consider those objections on appeal. TEX. R. APP. P. 33.1; *Seim*, 551 S.W.3d at 162–64; *Chance*, 395 S.W.3d at 315.

E.      Was Marathon required to prove the affirmative defense of setoff?

In its fifth challenge to the summary judgment order, 1776 argues Marathon did not establish that it "had a right to setoff" and, as a result, "the trial court should not have applied the revenues [Marathon] owed to [1776] under the Longhorn JOAs to debts [1776] allegedly owed under the Culberson-Hughes JOA." 1776 argues this is reversible error because "[a] trial court cannot grant a summary judgment on grounds not presented in the motion."

1776's response to Marathon's motion for summary judgment argued that 1776 was entitled to "any just offset and credits for its counterclaims *and amounts owed to 1776 by Marathon*." (emphasis added). A party generally "cannot complain on appeal that the trial court took a specific action that the complaining party requested[.]" *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005) (per curiam). Furthermore, Marathon was the plaintiff on the breach of contract claims resolved in the summary judgment order. The "right of setoff" that 1776 contends Marathon failed to prove is an affirmative defense against a breach of contract claim, not a required element of such a claim. *See Tenet Health Sys. Hosps. Dall., Inc. v. N. Tex. Hosp. Physicians Grp., P.A.*, 438 S.W.3d 190, 204 (Tex. App.—Dallas 2014, no pet.). 1776 cites no authority holding that a plaintiff is required to plead or prove a setoff defense to support a summary judgment on the plaintiff's own breach of contract claim, and we have found none. We therefore overrule this complaint.

F.      Was the trial court required to vacate the summary judgment based on evidence presented at trial?

In its final challenge to the summary judgment order, 1776 argues the trial court erred by denying 1776's motion to reconsider the summary judgment. A trial court that has granted a motion for summary judgment "generally has no obligation to consider further motions on the issues adjudicated by the summary judgment." *Macy v. Waste Mgmt., Inc.*, 294 S.W.3d 638, 651 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (internal quotation marks omitted). When a party asks a trial court to reconsider a prior summary judgment, the court has discretion "to simply deny [the motion for reconsideration] without considering its substance." *Charbonnet v. Shami*, No. 04-12-00711-CV, 2013 WL 2645720, at *5 (Tex. App.—San Antonio June 12, 2013, pet. denied) (mem. op.); *see also Circle X Land & Cattle Co., Ltd. v. Mumford Indep. Sch. Dist.*, 325 S.W.3d 859, 863 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (op. on reh'g) (when motion for reconsideration is filed after summary judgment, trial court "may ordinarily consider only the record as it existed before hearing the motion the first time"). Furthermore, a trial court may refuse to consider new evidence attached to a motion to reconsider a summary judgment. *PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723, 730–31 (Tex. App.—San Antonio 2014, pet. denied). Because the trial court had discretion to deny 1776's motion for reconsideration without considering its substance, we overrule 1776's argument on this point. *See id.*; *Charbonnet*, 2013 WL 2645720, at *5; *Macy*, 294 S.W.3d at 651.

Having overruled each of 1776's challenges to the summary judgment, we overrule 1776's first issue.

### *Pleading Amendment*

In its second issue, 1776 argues the trial court erred by denying its motion for leave to file a third amended counterclaim. This amended counterclaim would have alleged that Marathon's

cross-netting breached the JOAs and converted 1776's property. Marathon responds that the proposed amendment was prejudicial on its face.

*Standard of Review and Applicable Law*

The docket control order that was in effect at the relevant time indicates that the parties' pleading deadline had already expired when 1776 filed its motion for leave to amend. A trial court may enter a docket control order setting deadlines for the parties to amend their pleadings. TEX. R. CIV. P. 166; *Heirs of Garcia v. Parr*, No. 04-12-00767-CV, 2014 WL 3928602, at *9 (Tex. App.—San Antonio Aug. 13, 2014, pet. denied) (mem. op.). A trial court has broad discretion to enforce a docket control order. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001); *In re C.S.*, No. 01-07-00267-CV, 2007 WL 4231049, at *6 (Tex. App.—Houston [1st Dist.] Nov. 20, 2007, no pet.) (mem. op.). Once a docket control order's pleading deadlines have passed, the parties must obtain leave of court to amend their pleadings. TEX. R. CIV. P. 63; *Attalla v. Loyc Invs. Ltd. Co.*, No. 01-21-00078-CV, 2022 WL 2976223, at *5 (Tex. App.—Houston [1st Dist.] July 28, 2022, pet. denied) (mem. op.). The trial court must grant leave to amend unless: (1) the opposing party shows evidence of surprise or prejudice; or (2) the amendment is prejudicial on its face and the opposing party objects to the amendment. *See Halmos v. Bombardier Aerospace Corp.*, 314 S.W.3d 606, 622 (Tex. App.—Dallas 2010, no pet.); *San Antonio State Hosp. v. Koehler*, 981 S.W.2d 32, 37 (Tex. App.—San Antonio 1998, pet. denied) (if amendment is prejudicial on its face, opposing party need not show surprise or prejudice). An amendment is prejudicial on its face if it: "(1) asserts a new substantive matter which reshapes the nature of the trial; (2) is of such a nature that it could not have been anticipated in light of the development of the case up until the time of amendment; and (3) would detrimentally affect the opposing party's presentation of its case." *Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 566 S.W.3d 801, 827 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

"When, as here, amendments that introduce new substantive matters have been refused by the court under Rule 63, the burden of showing an abuse of discretion is on the complaining party, rather than on the opposite party to show surprise." *Oliva v. Davila*, 373 S.W.3d 94, 100 (Tex. App.—San Antonio 2011, pet denied); *see also Hardin v. Hardin*, 597 S.W.2d 347, 349–50 (Tex. 1980). A trial court's denial of a motion for leave to amend "will not be disturbed unless the complaining party shows a clear abuse of discretion." *Tex. Black Iron*, 566 S.W.3d at 827. A trial court abuses its discretion if its ruling is arbitrary, unreasonable, or without reference to guiding rules or principles. *Murphy v. Arcos*, 615 S.W.3d 676, 696 (Tex. App.—Dallas 2020, pet. denied) (op. on reh'g en banc). Under this standard of review, we may not substitute our judgment for the trial court's. *See Givens v. Anderson Columbia Co., Inc.*, 608 S.W.3d 65, 71 (Tex. App.—San Antonio 2020, pet. denied). "[A] trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance." *Id.*

*Application*

To determine if an amendment is prejudicial on its face, a trial court must first consider whether the amendment asserts a new substantive matter that would reshape the nature of the trial. *Tex. Black Iron*, 566 S.W.3d at 827. We do not believe the trial court behaved arbitrarily or unreasonably by concluding that 1776's proposed amendment did so for at least two reasons.

First, the trial court could have reasonably determined that the amended counterclaim would have "presented a new basis for liability" that Marathon had not prepared to defend against. *See Koehler*, 981 S.W.2d at 37. 1776's live counterclaim—its second amended—alleged that Marathon breached the Culberson Hughes JOA by refusing to promise that it would not apply 1776's cash call payment to debts owed under other JOAs. It is undisputed that 1776 never paid the cash call, so the question of what Marathon would have done with that payment was purely hypothetical. In contrast, 1776's proposed third amended counterclaim would have alleged that

Marathon breached the JOAs by cross-netting funds that actually existed and were owed to 1776. Despite 1776's insistence that both of these claims arise out of cross-netting, it has not argued that "the evidentiary proof required to support [the new breach of contract claim] is the same for an already pleaded cause of action[.]" *See Smith Detective Agency & Nightwatch Serv., Inc. v. Stanley Smith Sec., Inc.*, 938 S.W.2d 743, 749 (Tex. App.—Dallas 1996, writ denied).

Second, the trial court could have reasonably concluded that 1776's proposed amendment introduced a new damages model. 1776's existing anticipatory breach and repudiation claims tied 1776's damages to its inability to participate in the 2H, 3H, and 4H wells. Those claims did not allege that Marathon had actually received any funds that it was contractually obligated to pay 1776. In contrast, 1776's proposed amendment alleged that Marathon had, through cross-netting, received and withheld money that belonged to 1776. While 1776 argues this new damages model was "based on recently discovered matters," its motion for leave indicated that those matters were related to money owed to 1776 by Marathon on the existing wells. Neither 1776's motion for leave nor its appellate brief explains why 1776 could not have discovered that issue earlier through the exercise of reasonable diligence. "[W]hen it appears that the new matter was known to the party seeking to file the amendment, or by reasonable diligence it could have been known by the party, the request [to amend] should be denied." *Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 116 (Tex. App.—San Antonio 2011, pet. denied); *see also Zarate v. Rodriguez*, 542 S.W.3d 26, 38–39 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (noting party's "new cause of action was a claim that, by exercising reasonable diligence, she could have discovered and asserted much earlier").

The second factor in determining if an amendment is prejudicial on its face considers whether the amendment could "have been anticipated [by the opposing party] in light of the development of the case up until the time of amendment[.]" *Tex. Black Iron*, 566 S.W.3d at 827. Here, the "development of the case up until the time of amendment" includes the fact that the trial

court granted summary judgment for Marathon on its breach of contract claim before 1776 sought to amend its anticipatory breach claim. *See id.* 1776 argues Marathon nevertheless could have anticipated the proposed amendment because "Marathon admitted that the cross-netting claims had been in 1776 Energy's counterclaims all along." Marathon argued below, however, that it could not have anticipated the proposed amendment precisely because 1776 had long been aware of Marathon's cross-netting and did not assert that cross-netting breached the JOAs and supported a new damages model until late in the case. Marathon's response to 1776's motion for leave also noted that 1776 itself had previously described "offset[s]" and "revenue netting" as "general matters of accounting [that] are not anticipated to be hotly contested, if at all." On this record, we cannot say the trial court committed a clear abuse of discretion by crediting Marathon's argument over 1776's. *See Zarate*, 542 S.W.3d at 38–39; *see also Givens*, 608 S.W.3d at 71.

The final factor in the "prejudicial on its face" analysis asks whether the amendment would detrimentally affect the opposing party's presentation of its case. *Tex. Black Iron*, 566 S.W.3d at 827. As 1776 notes, the trial did not begin until six months after it sought leave to amend its counterclaim. But under the docket control order in effect at the relevant time, discovery closed nearly four months before 1776 sought leave to amend; indeed, the record shows that on the day the trial court denied 1776's motion for leave to amend, it also denied 1776's motion to reopen discovery. 1776 has not argued that Marathon could have defended against the new counterclaim without additional discovery, nor has it argued that Marathon could have successfully sought an extension of the discovery period. Furthermore, 1776 did not seek leave to allege that cross-netting breached the JOAs until several months after the trial court granted Marathon a summary judgment that accounted for cross-netting. The trial court could have reasonably determined that reopening an issue the parties had already litigated and the trial court had resolved in Marathon's favor would detrimentally affect Marathon's presentation of its case.

Under these circumstances, we cannot say the trial court acted arbitrarily or unreasonably by denying 1776's motion for leave to amend. *See Geis*, 362 S.W.3d at 116–17. We overrule 1776's second issue.

### *Exclusion of Bobigian's Testimony on Future Damages*

In its third issue, 1776 argues the trial court erred by excluding Bobigian's expert testimony on 1776's future damages.

### *Standard of Review and Applicable Law*

This court reviews a trial court's exclusion of expert testimony for abuse of discretion. *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). Even where a trial court errs in excluding evidence, such error usually is not reversible unless the complaining party "show[s] that the judgment turns on the particular evidence excluded or admitted." *Id.*; *Borkert v. Tworek*, No. 04-16-00529-CV, 2018 WL 842981, at *6 (Tex. App.—San Antonio Feb. 14, 2018, no pet.) (mem. op.).

### *Application*

After the trial court granted a directed verdict on 1776's fraud by nondisclosure claim, the jury rejected 1776's anticipatory breach and repudiation claims, so it did not answer the question submitted to it regarding 1776's damages. On appeal, 1776 suggests the jury refused to answer the damages question because 1776's causes of action "require a showing of 'injury' for a claimant to prevail" and Bobigian's excluded testimony on future damages would have established such injury. The record does not support this assertion. The liability questions on 1776's anticipatory breach and repudiation claims did not instruct the jury that injury was a required element of those claims. Because we must presume that the jury followed the instructions it was given, *see Hawley*, 284 S.W.3d at 862, we may not credit 1776's suggestion that the jury rejected its anticipatory

breach and repudiation claims because the trial court excluded Bobigian's testimony on future damages. *See Able*, 35 S.W.3d at 617.

With regard to 1776's fraud by nondisclosure claim, the trial court stated on the record why it directed a verdict in Marathon's favor:

> I don't find that there's any evidence that Marathon did anything [regarding the proposal of the new 2H, 3H, and 4H wells] that it didn't have a legal right to do under the contract. It may have let 1776 sweat about whether it was going to do something else, but it had the right to move the [drilling] dates around. I think it had the absolute right to propose those wells for whatever reason it wanted to propose them for [i]f they thought that they didn't amount to waste of the estate.

Nothing in the record indicates that the trial court rejected the fraud claim because 1776 failed to present evidence of damages. Accordingly, 1776 has not shown that the final judgment on that issue turned on the exclusion of Bobigian's testimony. *See id.*

We overrule 1776's third issue.

### ***Fraud by Nondisclosure***

In its fourth issue, 1776 argues the trial court erred by disposing of 1776's fraud by nondisclosure claim on directed verdict.

### *Standard of Review and Applicable Law*

This court "review[s] a trial court's grant of directed verdict de novo, using the legal sufficiency standard appellate courts apply to no-evidence summary judgments." *City of Baytown v. Schrock*, 645 S.W.3d 174, 178 (Tex. 2022) (footnote omitted). In reviewing a directed verdict, this court may consider "any reason the directed verdict should have been granted, even if that reason was not explicitly stated by the movant." *Pena v. Guerrero*, No. 04-19-00874-CV, 2020 WL 7232136, at *10 (Tex. App.—San Antonio Dec. 9, 2020, no pet.) (mem. op.) (citing *Ibarra v. Nat'l Constr. Rentals, Inc.*, 199 S.W.3d 32, 37 (Tex. App.—San Antonio 2006, no pet.)).

A directed verdict is proper if a claimant fails to present evidence that raises a genuine issue of material fact on one or more of the required elements of the claim. *See, e.g.*, *Hudson v. Cooper*, 162 S.W.3d 685, 687–88 (Tex. App.—Houston [14th Dist.] 2005, no pet.). The required elements of fraud by nondisclosure are: "(1) the defendant concealed from or failed to disclose certain facts to the plaintiff; (2) the defendant had a duty to disclose the facts to the plaintiff; (3) the facts were material; (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (5) the defendant was deliberately silent when he had a duty to speak; (6) by failing to disclose the facts the defendant induced the plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the defendant's nondisclosure; and (8) the plaintiff was injured as a result of acting without the undisclosed facts." *Bazan v. Munoz*, 444 S.W.3d 110, 119 (Tex. App.—San Antonio 2014, no pet.).

*Application*

1776's fraud by nondisclosure claim is based on its allegation that Marathon did not intend to drill the 2H, 3H, and 4H wells if 1776 paid the required cash call. 1776 alleged Marathon proposed the wells solely to "wrest 1776's significantly greater working interest from [it], or if unsuccessful to simply not drill the proposed wells at all." On appeal, 1776 argues there is more than a scintilla of evidence that: (1) Marathon failed to disclose that it did not intend to drill the wells;[4] (2) Marathon had a duty to disclose that alleged fact; (3) Marathon knew 1776 did not have an equal opportunity to discover Marathon's true intent; (4) Marathon intended to induce 1776 to act or refrain from acting; and (5) 1776 was injured as a result of acting without fact of the undisclosed alleged fact.

---

[4] The record shows Marathon did, in fact, drill the 2H, 3H, and 4H wells.

After reviewing the evidence, we hold the trial court correctly concluded that 1776 failed to raise a fact issue on a required element of its fraud by nondisclosure claim. 1776's brief argues, inter alia, "The Cash Call Letter and AFEs ***did not*** indicate that Marathon planned to apply the Cash Call Amount to other debts and then deem 1776 Partners to be a non-consenting party to the Culberson Hughes 2H, 3H, and 4H wells." (emphasis in original). Again, however, 1776 never paid the cash call. 1776 cites no provision of the JOA and no legal authority showing that Marathon had a duty to disclose what it planned to do with funds 1776 never paid. Accordingly, 1776 has not shown that more than a scintilla of evidence supports the "duty to disclose" element of its fraud by nondisclosure claim. *See id.*

Even if Marathon owed such a duty, the record does not support 1776's contention that it was ignorant of the true facts and did not have an equal opportunity to discover those facts. *See id.* The evidence shows that both 1776 and its outside funders: (1) assumed Marathon would apply the cash call to 1776's outstanding debts; and (2) repeatedly asked Marathon to promise it would not do so. This evidence conclusively negates the fourth element of 1776's fraud by nondisclosure claim. *See id.*; *see also Watkins v. Rolling Frito-Lay Sales, LP*, No. 05-16-00367-CV, 2017 WL 2665985, at *4 (Tex. App.—Dallas June 21, 2017, no pet.) (mem. op.) (affirming directed verdict where evidence conclusively negated required element).

Finally, we see no evidence that 1776 was damaged by acting without the undisclosed facts. Like any fraud claim, fraud by nondisclosure requires the claimant to show that his damages were caused by the defendant's culpable acts. *See Potter v. HP Tex. 1 LLC*, No. 05-18-01513-CV, 2020 WL 1672556, at *7 (Tex. App.—Dallas Apr. 6, 2020, no pet.) (mem. op.). 1776 argues that it "would have received $2,555,010.00 in profits from the Culberson Hughes 2H, 3H, and 4H Wells had Marathon applied the Cash Call Amount to those wells only or if 1776 Partners had more time to secure funding." But 1776 did not participate in the new wells because it never paid the cash

call, and it identifies no evidence showing that Marathon's purported nondisclosure caused that nonpayment. Furthermore, it is undisputed that Marathon gave 1776 an extension of time to secure the funding necessary to participate in the new wells. 1776 cites no evidence showing it would have paid the cash call if Marathon had granted it a second extension.

We overrule 1776's fourth issue.

### Jury Question on Repudiation

In its sixth issue, 1776 argues the jury question on repudiation misstated the law and likely confused or misled the jury.

#### Standard of Review and Applicable Law

We review a trial court's submission of jury questions and instructions for abuse of discretion. *Hawley*, 284 S.W.3d at 856. A trial court abuses its discretion if its decision was arbitrary, unreasonable, or without references to guiding rules or principles. *See id.*

"A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question . . . on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX. R. CIV. P. 274. To preserve a complaint for appellate review, "a party's argument on appeal must comport with its argument in the trial court." *Watts v. Watts*, 396 S.W.3d 19, 23 (Tex. App.—San Antonio 2012, no pet.); *see also Hamid v. Lexus*, 369 S.W.3d 291, 296 (Tex. App.—Houston [1st Dist.] 2011, no pet.). The objection below must be specific enough to show "that [the] trial court was fully cognizant of the ground of complaint and deliberately chose to overrule it." *Hamid*, 369 S.W.3d at 296 (internal quotation marks omitted, alteration in original).

#### Application

1776 argues the repudiation question misstated the law by conditioning Marathon's liability on a finding that Marathon expressly communicated to 1776 that it was repudiating

without just excuse. In the trial court, 1776 did not object to the inclusion of the word "communicate." In fact, when Marathon objected that there was no evidence of a communication expressing repudiation, 1776 responded, "There has been evidence." Accordingly, to the extent that 1776 now challenges the inclusion of the word "communicate" in the submission of this issue, that complaint does not conform to the arguments it made below. TEX. R. CIV. P. 274; *Hamid*, 369 S.W.3d at 296.

1776 objected below that the phrase "without just excuse" should be submitted, if at all, as part of a separate instruction, rather than in the question itself. 1776's counsel stated:

> [T]o excuse the failure to comply with repudiation it has to be without just excuse. I don't think it's appropriate to modify whether or not Marathon repudiated the Culberson Hughes JOA without just excuse. That goes to whether or not 1776 that [*sic*] was excused.

This objection does not comport with the argument in 1776's appellate briefing. *See Hamid*, 369 S.W.3d at 296. On appeal, 1776 argues that the inclusion of the phrase "without just excuse" in the repudiation question may have confused or misled the jury into "believing that Marathon needed to *literally* communicate to 1776 Partners that: 'We are repudiating the Culberson Hughes JOA without just excuse.'" The objection 1776 raised below did not inform the trial court that 1776 believed the proposed instruction might confuse or mislead the jury. *See Allstate Vehicle & Prop. Ins. Co. v. Reininger*, No. 04-19-00443-CV, 2021 WL 2445622, at *7 (Tex. App.—San Antonio June 16, 2021, pet. denied) (mem. op.). We therefore decline to consider this complaint on appeal. TEX. R. CIV. P. 274; *Reininger*, 2021 WL 2445622, at *7.

1776 also contends that the repudiation submission should have instructed the jury that a "nonrepudiating party may treat a repudiation as a breach of contract." 1776 argues, "Because the instruction was not included, the Jury may have been confused as to the effect of the materiality of the finding that Marathon repudiated the JOA." But the jury found Marathon did not repudiate

the JOA, and 1776 has not challenged that finding. As a result, even if the trial court erred by refusing the requested instruction, 1776 has not shown that error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1; *cf. Shupe v. Lingafelter*, 192 S.W.3d 577, 580 (Tex. 2006) (per curiam) (failure to submit issue rendered harmless by jury's other answer negating that issue).

We overrule 1776's sixth issue.

### *1776's Remaining Issues*

Under the heading of its seventh issue, 1776 asserts eight sub-issues that can be grouped into two categories: (1) 1776's challenges to the final judgment's award of damages to Marathon; and (2) 1776's challenges to the award of attorney's fees to Marathon.

### *1776's Challenges to the Final Judgment's Award of Damages to Marathon*

A.      Was 1776 still in default on the JOAs at the time of trial?

In its first sub-issue, 1776 contends the damages award in the final judgment should be reversed because "by the time the trial took place, 1776 Energy was no longer in default on any of the JOAs" and "1776 was owed credits." The exhibit upon which 1776 relies does not support this argument. That exhibit shows that at the time of trial, 1776 had a credit balance on the Culberson Hughes and Longhorn JOAs, but not the Bordovsky JOA. A Marathon accountant, Lori Lewis, testified that Marathon had applied the Culberson Hughes and Longhorn credits to 1776's debt under the Bordovsky JOA and that 1776 still owed Marathon money after the application of those credits. While 1776 questioned Lewis sharply on cross-examination, she maintained that 1776 owed an outstanding debt under the Bordovsky JOA, and 1776 did not present any evidence to controvert that testimony.

B.      Was the trial court required to submit Marathon's damages to the jury?

In its second, third, and fourth sub-issues, 1776 argues: (1) it was denied a trial on Marathon's damages because the trial court refused to submit that issue to the jury; (2) Marathon waived its claim for damages by failing to submit a jury question on that issue; and (3) the amount of Marathon's damages was controverted at trial and the trial court therefore made improper fact findings on the amount owed. While 1776 concedes that "a trial court is not required to submit an issue on an undisputed fact," it claims that "the Record shows that the amount of Marathon's damages was definitely controverted."

On this record, the trial court did not err by refusing to submit Marathon's damages to the jury. An interlocutory order granting summary judgment eliminates the necessity for the summary judgment movant to introduce evidence at trial regarding the issues resolved in the order. *See Cunningham v. Eastham*, 465 S.W.2d 189, 193 (Tex. App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.). This is because summary judgment is only proper on issues that are conclusively established as a matter of law. *See* TEX. R. CIV. P. 166a(c). "Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005) (footnote omitted). If the evidence is such that it "can be viewed in only one light," the issues arising out of that evidence "need not be submitted to a jury at all" because jurors may not properly reach a verdict contrary to such evidence. *Id.* at 814–15. While the amount of a party's unliquidated damages frequently presents a question of fact to be resolved by a jury, that amount can, under certain circumstances, be established as a matter of law. *See, e.g.*, *State v. Huffstutler*, 871 S.W.2d 955, 960–61 (Tex. App.—Austin 1994, no writ) ("A trial court is allowed to render judgment notwithstanding the verdict *and* to substitute its own judgment of the proper measure of damages, but only in certain specific circumstances.").

Here, the May 3, 2018 summary judgment order determined that 1776 owed Marathon: (1) $1,963,800.06 in principal under the Bordovsky JOA; (2) $563,001.24 in interest under the Bordovsky JOA; and (3) $838,123.28 in principal and interest under the Culberson Hughes and Longhorn JOAs. During the April 2019 jury trial, Marathon presented evidence showing how its cross-netting since the summary judgment order had reduced 1776's debt. The trial court permitted Marathon to present this evidence to the jury "to show what the basis is for [Marathon] asking for attorney's fees."

1776 appears to argue that because the trial court admitted evidence on Marathon's updated damages, it necessarily reconsidered its prior summary judgment order and was therefore required to submit Marathon's damages to the jury. As support for this proposition, 1776 cites Texas Supreme Court authority considering situations in which a trial court withdrew a previous summary judgment order without allowing the parties to further litigate the issues resolved on summary judgment. In those cases, the supreme court determined that the trial court denied the parties "a fair opportunity to present evidence on issues that the court reinjected into the case by withdrawing the summary judgment." *See Bi-Ed, Ltd. v. Ramsey*, 935 S.W.2d 122, 123–24 (Tex. 1996) (per curiam); *Elder Constr., Inc. v. City of Colleyville*, 839 S.W.2d 91, 91–92 (Tex. 1992) (per curiam). Here, however, nothing in the record indicates that the trial court withdrew, set aside, or otherwise reconsidered its determination that Marathon had conclusively shown that 1776 breached the JOAs and Marathon was entitled to damages. *See Cunningham*, 465 S.W.2d at 193 ("There is nothing in the record leading to an obvious conclusion that the trial judge set aside the pre-trial order[.]").

1776 does not contend that it presented any evidence below showing it owed Marathon a different amount than that listed in the final judgment. Instead, it relies primarily on its cross-examination of Lewis to argue that Marathon's damages evidence was not conclusive. After

thoroughly reviewing the record, we conclude 1776's arguments on this point inaccurately describe both Lewis's testimony and the documentary evidence underlying that testimony.

First, 1776 argues that "Marathon's Exhibit 68A shows two different amounts due and owing." This is not correct. Marathon's Exhibit 68A shows one "Total Amount Due to Marathon": $2,442,274.51. This amount consisted of $2,058,767.83 in "Bordovsky – Principal" (i.e., revenues owed by 1776); $801,930.54 in "Bordovsky – Interest"; $144,542.85 in "Bordovsky – Invoice and Interest," which represents JIBs 1776 did not pay to Marathon on the Bordovsky JOA;[5] $93,321.61 in credit owed to 1776 under the Culberson Hughes JOA; and $469,645.10 in credit owed to 1776 under the Longhorn JOAs. While there are multiple numbers listed in Exhibit 68A, those numbers add up to one "Total Amount Due."

1776 also argues, "Marathon's Exhibit 66A contradicts both amounts listed in Exhibit 68A." Again, Exhibit 68A listed only one total amount owed to Marathon. Additionally, the record clearly explains the purported differences between Exhibits 68A and 66A. While the amount of Bordovsky principal listed in Exhibit 68A is higher than that listed in Exhibit 66A, the amount in Exhibit 68A is identical to the amount listed in Marathon's Exhibit 66**B**. Lewis testified that Marathon created Exhibit 66B to show what 1776 would owe Marathon in principal and interest under the Bordovsky JOA "[i]f there was no revenue netting." In other words, Exhibits 68A and 66B show the "un-netted" amount of Bordovsky principal due, while Exhibit 66A shows the credits owed to 1776 have already been applied. Furthermore, Exhibit 66A shows only the principal and interest owed to Marathon for unpaid Bordovsky revenues. It does not specify the "netted" credits that Marathon applied to reach that number, and it does not include any amounts for JIBs that 1776 failed to pay under the Bordovsky JOA. In contrast, the "amount due" chart at

---

[5] The record does not indicate why non-operator Marathon sent JIBs to 1776 on the Bordovsky well.

the bottom of Exhibit 68A shows a cumulative total that includes the relevant credits and debts from all of the JOAs:

| Amount Due | |
|---|---|
| $ (93,321.61) | Culberson - Credit |
| $ (469,645.10) | Longhorn - Credit |
| $ 144,542.85 | Bordovsky - Invoice + interest |
| $2,058,767.83 | Bordovsky - Principal |
| $801,930.54 | Bordovsky - Interest |
| $ 2,442,274.51 | Total Amount Due to Marathon |

The purported discrepancies 1776 relies on are, therefore, not true discrepancies, but instead figures that show the damages amounts two ways—with cross-netting and without cross-netting. From summary judgment through trial, cross-netting was applied. Because the differences between Exhibits 66A and 68A would not allow reasonable people to disagree about the amount of Marathon's damages, they do not show that the amount of Marathon's damages was controverted at trial. *See City of Keller*, 168 S.W.3d at 816.

1776 also argues that Lewis's testimony and the "Amount Due" chart in Exhibit 68A were inconsistent with the numbers shown in Exhibit 68A. Again, however, we do not believe any of the purported discrepancies would allow reasonable people to disagree on Marathon's damages:

- 1776 first contends that "Exhibit 68A shows the principal owed on Bordovsky as being only $122,644.30." But Lewis testified that the portion of Exhibit 68A that 1776 relies on for this assertion shows only 1776's unpaid JIBs under the Bordovsky JOA and does not show the unpaid revenues owed to Marathon. 1776 did not present any evidence to controvert this testimony.

- Next, 1776 asserts that "Lewis admitted that the damages amount could be off by approximately $144,000." The portion of the record 1776 cites for this assertion involves a discussion of Lewis's summary judgment declaration, not her trial testimony or exhibits. Lewis testified that her summary judgment declaration contained estimates Marathon made based on the best information available to it at that time. She testified that these estimates were necessary because at that time, 1776 had told Marathon how much oil and gas had been sold from the Bordovsky wells, but not the price at which they had sold. While 1776 implies Lewis testified that her declaration's estimate was $144,000 higher than the amount

actually owed to Marathon, she did not. To the contrary, Lewis testified that after she made her declaration, Marathon received "a revenue statement from 1776 that included volumes, as well as price. And that price that [1776] had received for the product was actually higher than the price [Marathon] had used [in Lewis's declaration]. . . . And so they owed us approximately 100,000 more in principal than what I estimated." Lewis did not testify that any of the charts presented at trial were estimates, and 1776 did not present any evidence to controvert Lewis's testimony on these points. This failure to present controverting evidence is significant, because Lewis testified that it would be "very unusual" for 1776 to rely on Marathon's information to determine what it owed on the Bordovsky wells because "it's [1776's] operated wells and they have the volumes and they know the price they got." *Cf.* TEX. R. CIV. P. 166a(c).

- 1776 then argues that "Lewis testified it is possible 1776 Energy was overpaying Marathon on the Bordovsky 1H and 2H wells" and that she "admitted that Marathon did not credit 1776 Energy for the overpayment on the Bordovsky 1 and 2H wells." Lewis testified that one of 1776's checks to Marathon "had a different net revenue interest"[6] and that she "never found out whether their interest was correct or our interest was correct." She further testified that she had stated in her deposition that if "their interest was correct, that they had been overpaying us by .5 percent." Lewis also testified, however, that she checked the net revenue interest, "which is what [she] used to calculate Marathon's amount due," to see "whether it matched what was in our accounting system" and that "[i]t matched in our accounting system." Lewis did not admit that Marathon failed to credit 1776 for an overpayment—she did not admit that any such overpayment had occurred. 1776 does not identify any evidence showing that an overpayment actually occurred. *Cf. id.*

- 1776 contends, "Lewis testified that the amount of interest owed on the Bordovsky JOA had increased to $2,421,050.77," but that Exhibit 68A shows the total interest as $21,898.55. The portion of Exhibit 68A upon which 1776 relies shows the amount of interest owed on unpaid Bordovsky JIBs, not the interest on unpaid Bordovsky revenue. Accordingly, 1776's assertion that that exhibit shows "the total interest as $21,898.55" is factually incorrect. While it is true that the reporter's record appears to show that Lewis stated, "The amount of interest is $2,421,050.77," the record also clearly shows that Lewis was referring to Marathon's Exhibit 66A at that time. Exhibit 66A shows the total amount of principal **and** interest due under the Bordovsky JOA "w[ith] revenue payments" as $2,421,050.77.

- 1776 argues, "The bottom of Exhibit 68A claims that the principal owed on Bordovsky JOA is $801,940.54." Exhibit 68A clearly labels this amount as "Bordovsky – Interest," not principal.

- 1776 argues that Lewis admitted "to not knowing if the interest was calculated correctly." The record citation 1776 provides for this assertion comes from the net revenue interest discussion addressed above. As noted above, Lewis testified that she checked the net revenue interest in question and "[i]t matched in our accounting system." Nothing in

---

[6] Net revenue interest is a number that is multiplied by the gross revenue from production to calculate net revenue owed to a particular owner.

Lewis's testimony indicates that she did not know the proper percentage of contractual interest to apply to 1776's debts under the Bordovsky JOA.

- 1776 also argues that "[t]he debts allegedly owed on the Longhorn JOA and the Culberson Hughes 301H Well were also controverted" because "Exhibit 68A does not show 'credit balance' on the Culberson Hughes 301H Well being applied to the Bordovsky JOA." But Exhibit 68A plainly shows a "Culberson – Credit" of $93,321.61 being applied to reach the total amount due to Marathon. Lewis testified that amount "represent[s] the amount of revenue that we have netted from [the Culberson Hughes 301H well] and have applied toward the Bordovsky." She also testified that Marathon had not written 1776 a check for that amount "[b]ecause there was still outstanding debt from the Bordovsky revenues that 1776 owed us." Nothing in Lewis's testimony implied that Marathon did not apply 1776's revenues earned under the Culberson Hughes and Longhorn JOAs to 1776's outstanding debt.

- 1776 also suggests that Lewis admitted that "Exhibit 68A shows that Marathon may have also improperly withheld $1,032,998.21 from 1776 Energy." We see no such admission in Lewis's testimony. That number appears at the bottom of the "Monthly Activity" column of Exhibit 68A for the Culberson Hughes 301H well. Lewis testified that column shows "how much was billed or paid" in each month listed. She also testified that the $1,032,998.21 total in that column shows "the amount of JIB activity that would have been hitting the account and the revenue netting." Nothing in Lewis's testimony supports a conclusion that this amount was not applied to 1776's debts or that it exceeded the debt 1776 owed.

- 1776 next argues that "Lewis admitted that *Marathon withheld $2,358,891.72 in revenues due and owing to 1776 Energy on the Longhorn JOAs*" (emphasis in original). Again, Lewis made no such admission. Lewis testified that the $2,358,891.72 amount listed in Marathon's Exhibit 68A was "the cumulative balance of recovery revenues on that particular unit" and that the amount of that cumulative balance "that has not been used from the Longhorn Wells to recover prior debts" was $427,731.59.[7] Lewis did not at any point admit that Marathon owed 1776 $2,358,891.72.

- Finally, in a different section of its brief, 1776 similarly argues that in her deposition, Lewis "admitted that 1776 admitted that 1776 Energy no longer owed any unpaid costs or expenses on the Longhorn JOAs" and "admitted that *Marathon actually owes 1776 Energy $1,840,945.28* before calculating interest" (emphasis in original). 1776 did not admit Lewis's deposition testimony into evidence or read any portions of that testimony into the record. In any event, Lewis unequivocally testified that 1776 accrued credits on the Longhorn and Culberson Hughes JOAs and Marathon applied those credits to unpaid amounts 1776 owed under the Bordovsky JOA. She did not testify that Marathon owed 1776 $1,840,945.28.

---

[7] Exhibit 68A shows a slightly larger credit to 1776: $469,645.10. The final judgment includes Exhibit 68A's credit.

1776 also contends that Bobigian "confirmed that Marathon has not shown that the amounts Marathon owes 1776 Energy on the Longhorn JOAs was applied to any other JOA" and that "Bobigian further testified that Marathon was not netting the Longhorn debt. Marathon was simply 'keeping' it." This argument, too, is inconsistent with the record. Bobigian did testify that he believed Marathon owed 1776 "4– or $500,000 . . . for the first month's production" on new wells drilled under the Longhorn JOAs after the commencement of this lawsuit. Additionally, 1776's counsel suggested at trial, and Bobigian agreed, that Lewis's testimony and documentation did not show "anything about any type of application of that debt to the Bordovsky." But Marathon's Exhibit 68A clearly shows a "Longhorn – Credit" of $469,645.10 as of April 2019. That number is consistent with Bobigian's testimony that he believed 1776 was owed "4– or $500,000" at the time of the April 2019 trial. Moreover, Bobigian did not testify, as 1776 now implies, that Marathon was not cross-netting these new wells' alleged revenues against 1776's existing debt. To the contrary, he testified that Marathon had originally promised not to cross-net the new wells' revenues, but then later told him it was "going to use [that revenue] to pay what you owe on the Bordovsky."

At its core, 1776's contention that Marathon did not conclusively prove its damages appears to rest on an assumption that Marathon's cross-netting "improperly withheld" money from 1776. As noted above, 1776 did not timely plead that cross-netting breached the JOAs. 1776 therefore has not shown that a jury question was either required or proper on the issues of whether: (1) Marathon's cross-netting breached the JOAs; or (2) Marathon's allegedly improper cross-netting entitled 1776 to a monetary recovery. *See* TEX. R. CIV. P. 278; *see also* TEX. R. CIV. P. 301. Nor has 1776 shown that the mere fact of Marathon's cross-netting would permit reasonable people to disagree about whether Marathon was entitled to recover the amounts listed in the final judgment.

After reviewing the record, we see no evidence that would allow reasonable people to disagree about whether 1776 owed the amounts awarded to Marathon in the final judgment. As a result, there was no need to submit that issue to the jury. *See City of Keller*, 168 S.W.3d at 814–16. We therefore overrule 1776's complaint on this point.

C.      Does the final judgment improperly offset Marathon's damages?

In its fifth sub-issue, 1776 argues the final judgment improperly offsets Marathon's damages because Marathon "did not plead that [it] had a right to cross-net 1776 Energy's revenues, nor did Marathon prove they had a right to cross-net." 1776 also argues that the amount of damages awarded in the final judgment does not comport with the evidence presented at trial. As noted above, "setoff" or "offset" is an affirmative defense to a breach of contract claim. *See Tenet Health Sys.*, 438 S.W.3d at 204; *see also Nussbaum v. OneWest Bank, FSB*, No. 05-13-00081-CV, 2014 WL 2151996, at *3 (Tex. App.—Dallas May 21, 2014, pet. denied) (mem. op) ("The terms 'offset' and 'setoff' are commonly used interchangeably."). 1776 has not cited any authority holding that Marathon was required to plead or prove an affirmative defense in support of its own breach of contract claim.

1776 also argues that Marathon's Exhibit 68A shows Marathon withheld $2,358,891.72 in revenues from the Longhorn JOA, that Marathon only applied $1,566,140.82 of revenues from the Longhorn JOA to debts owed under the Culberson Hughes JOA, and that 1776 owes only $122,644.30 in principal and $21,898.55 in interest under the Bordovsky JOA. The record does not support 1776's assertion that this evidence contradicts the final judgment.

First, Lewis testified that the $2,358,891.71 amount was "the cumulative balance of recovery revenues" under the Longhorn JOA and that the amount of that cumulative balance "that has not been used from the Longhorn Wells to recover prior debts" was $427,731.59. Exhibit 68A shows a slightly larger credit to 1776—$469,645.10—which is accounted for in the final

judgment's amount still owed on the Bordovsky debt. Second, while Exhibit 68A's chart on the Culberson Hughes well contains a column showing a final "Rev Net Longhorn" of $1,566,140.82, 1776's brief does not explain why this entry is inconsistent with the trial court's judgment; we see nothing in the record to support a conclusion to that effect. Finally, the $122,644.30 in principal and $21,898.55 in interest under the Bordovsky JOA that 1776 points to in Exhibit 68A are for unpaid JIBs under that JOA. That sum does not include revenue and interest on revenue owed to Marathon under that JOA. For these reasons, 1776 has not shown that the final judgment improperly offsets Marathon's damages.

D.      Does the final judgment improperly increase the damages awarded in the summary judgment order?

In its sixth sub-issue, 1776 argues the final judgment "improperly increased the amount of damages awarded to Marathon" under the Bordovsky JOA. 1776 contends that the final judgment awarded Marathon $2,058,767.83 in unpaid revenues under the Bordovsky JOA, whereas the summary judgment order awarded Marathon only $1,963,800.06 in unpaid Bordovsky revenue. This argument ignores that the final judgment listed $2,058,767.83 as part of the total amount owed by 1776 before any applicable credits. The final judgment went on to state, however, that after the application of relevant credits, 1776 owed Marathon $1,618,445.52 in principal on the Bordovsky debt. Additionally, the ultimate "TOTAL AWARD TO MARATHON" subtracts $122,644.40[8] from the unpaid Bordovsky principal. That subtracted amount represents unpaid JIBs on which the trial court rendered judgment for Marathon, but which Marathon elected not to recover in this lawsuit. The record does not support 1776's contention that the judgment contains an improper "additur."

---

[8] 1776 argues this amount "is awarded twice," but the judgment does not show that this amount was awarded at all. That amount is included in the $1,618,445.52 in Bordovsky principal on which the trial court rendered judgment for Marathon, but it is subtracted from the "TOTAL AWARD TO MARATHON."

E.      Is the final judgment sufficiently certain?

In its seventh sub-issue, 1776 argues the final judgment is not sufficiently certain because its award of damages is "contingent on an appellate ruling." We have already concluded that the judgment is final and appealable. *See In re Elizondo*, 544 S.W.3d at 828–29. We further hold that the judgment provides a "definite means of ascertaining" the parties' rights. *See Stewart v. USA Custom Paint & Body Shop, Inc.*, 870 S.W.2d 18, 20 (Tex. 1994). This is because the district clerk can ministerially review court documents—i.e., this court's judgment and mandate—to determine the total amount due to Marathon. *See Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 60–61 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Accordingly, the judgment is sufficiently certain to be enforceable.

1776 also argues the judgment awards Marathon an improper double recovery. "A double recovery exists when a plaintiff is awarded more than one recovery for the same injury." *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 76 (Tex. App.—San Antonio 2011, no pet.). Here, the final judgment plainly indicates that Marathon may only recover one of the two listed measures of damages. *See id.*

For these reasons, we overrule each of 1776's challenges to the amount of damages listed in the final judgment.

### *1776's Challenge to the Final Judgment's Award of Attorney's Fees to Marathon*

In its eighth sub-issue challenging the final judgment, 1776 argues the trial court erred by awarding Marathon $686,250 for attorney's fees incurred after the May 3, 2018 summary judgment.

A.      Basis for the fee award and segregation of fees

1776 first argues that the Culberson Hughes JOA does not permit Marathon to recover any attorney's fees it incurred after the May 3, 2018 summary judgment because "none of the fees

incurred by Marathon after May 3, 2018 were to collect financial obligations owed by 1776 Energy on the Culberson Hughes JOA." The final judgment is clear that the fees awarded for Marathon's breach of contract claim were "incurred through the May 3, 2018 [S]ummary [J]udgment Order." While Marathon's requests for declaratory relief sought interpretations of the Culberson Hughes JOA, it requested its attorney's fees arising out of those declarations under the UDJA, not under the JOA. *See* TEX. CIV. PRAC. & REM. CODE § 37.009. 1776 has not shown that the trial court improperly awarded any post-summary judgment attorney's fees under the Culberson Hughes JOA.

Marathon incurred post-summary judgment attorney's fees in: (1) prosecuting Marathon's own UDJA claims (which the summary judgment order expressly conditioned on the outcome of 1776's counterclaims); and (2) defending against 1776's anticipatory breach, repudiation, fraud by nondisclosure, and UDJA counterclaims. The trial court rendered multiple declarations in Marathon's favor under the UDJA, and 1776 does not argue that those declarations were improper or ask this court to reverse them. Nor does it dispute that Marathon could properly recover at least some of its attorney's fees for prosecuting its own UDJA claims and defending against 1776's UDJA counterclaims. *See id.* 1776 argues, however, that the UDJA did not permit the trial court to award attorney's fees to Marathon for its defense against 1776's fraud claim and that Marathon did not properly segregate its attorney's fees.

A claimant seeking attorney's fees must "segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). An exception to this general rule exists "when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts." *Id.* (internal quotation marks omitted). "Intertwined facts do not make tort fees recoverable; it is only when discrete legal

services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313–14. The issue of whether fees can be segregated is subject to "a hybrid standard of review" because that issue presents a mixed question of law and fact. *See Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*, 269 S.W.3d 628, 641 (Tex. App.—San Antonio 2008, pet. granted, judgm't vacated by agr.).

The purportedly unrecoverable fees are those Marathon incurred in defending against 1776's fraud by nondisclosure claim. That claim arose out of 1776's assertion that Marathon proposed the 2H, 3H, and 4H wells as a ruse to obtain 1776's ownership interest in those wells. As noted above, Marathon sought and received a number of declarations regarding the parties' obligations under the JOAs, and the trial court directed a verdict in Marathon's favor on 1776's fraud claim because it concluded Marathon had a contractual right to propose the new wells "for whatever reason it wanted to propose them for." Stated differently, Marathon sought and received declarations on its legal rights under the contract, and the record shows those contractual rights directly influenced the trial court's decision to direct a verdict on 1776's fraud claim. The record therefore supports a conclusion that the legal services that advanced Marathon's UDJA claims also advanced its defense against 1776's fraud claim. *See Chapa*, 212 S.W.3d at 313–14.

Additionally, Marathon's expert on attorney's fees, attorney Darrell Barger, testified that after reviewing the parties' pleadings, the motions filed in this case, and Marathon's attorneys' invoices, he concluded that "the same basic principles of the evidence" would apply to Marathon's defenses against both 1776's breach of contract claims and its fraud claim. When he was asked whether Marathon's attorneys performed more work on the breach of contract issues or the fraud issues, Barger testified, "In my opinion, it's all the same. But most of the work is done on the defending of the—and a presentation of the declaratory judgment." He further testified, "In my opinion, it's all the same [work]" in prosecuting Marathon's own UDJA claims and defending

against 1776's claims for breach of contract and fraud, and he stated, "The fraud is intertwined in the breach of contract; so it's all, in my opinion, the same issue." He also opined that "It's going to be the same evidence. It may be different legal questions asked by the Court at the end of the day, but it's all the same evidence from that standpoint." On cross-examination, Barger testified that he "did not pull out any percentage for fraud" because he did "not see how [he] could possibly" segregate the work Marathon's lawyers performed in defending against 1776's breach of contract claim from the work they performed in defending against 1776's fraud claim.

Based on this record, we do not believe the trial court erred by concluding that Marathon's fees could not be segregated. *See Lowry v. Tarbox*, 537 S.W.3d 599, 619 (Tex. App.—San Antonio 2017, pet. denied). We therefore overrule 1776's argument to the contrary.

B.     Evidentiary support for the fee award

1776 also argues the evidence is insufficient to support the fee award. When a party challenges the legal sufficiency of an adverse finding on which it did not have the burden at trial, it must establish that no evidence supports the finding. *John Deloach Enters., Inc. v. Telhio Credit Union, Inc.*, 582 S.W.3d 590, 595 (Tex. App.—San Antonio 2019, no pet.). In reviewing a legal sufficiency challenge, this court views the evidence in the light most favorable to the finding. *Id.* A factual sufficiency challenge requires the complaining party to show that the evidence supporting the finding is so weak as to make the finding clearly wrong and unjust. *See, e.g.*, *In the Matter of the Marriage of Thrash*, 605 S.W.3d 224, 230 (Tex. App.—San Antonio 2020, pet. denied). In considering a factual sufficiency challenge, this court considers all the evidence and may reverse the finding only if it is against the great weight and preponderance of the evidence. *See, e.g.*, *Baribeau v. Gustafson*, 107 S.W.3d 52, 61 (Tex. App.—San Antonio 2003, pet. denied).

A fee award under the UDJA must be both reasonable and necessary—which is a matter to be determined by the jury—and equitable and just, which is a matter to be determined by the court.

*See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998); *see also* TEX. CIV. PRAC. & REM. CODE § 37.009. "When a fee claimant seeks to recover attorney's fees from an opposing party, it must put on evidence of reasonable hours worked multiplied by a reasonable hourly rate, yielding a base figure that can be adjusted by considerations not already accounted for in either the hours worked or the rate." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 475 (Tex. 2019).

Here, the jury determined that Marathon incurred $1,190,000 "[f]or representation in the trial court," and the trial court rendered judgment that Marathon was entitled to recover $686,250 of that amount as fees incurred after the May 3, 2018 summary judgment. 1776 argues Marathon did not present sufficient evidence that it incurred $686,250 in fees after the summary judgment. 1776 notes, however, that Marathon presented more than two years' worth of its attorneys' invoices and "[e]xpert testimony that the total to pursue the declaratory judgment claim and defend against 1776's fraud and contract claims was $915,000." 1776 does not argue that Marathon's attorneys charged unreasonable hourly rates, logged an unreasonable number of hours, or performed unnecessary work. Nor does 1776 contend that the invoices lack sufficient detail about the work done or that Barger's testimony was "too general to establish that the requested fees were reasonable and necessary." *Id.* at 505.

We conclude the evidence is legally and factually sufficient to support the amount of post-summary judgment fees listed in the final judgment. We therefore overrule 1776's contention that there is no evidence to support that amount.

Having overruled each of 1776's sub-issues, we overrule 1776's seventh issue.

### CONCLUSION

We reverse the trial court's declaratory judgment in favor of 1776 and render judgment dismissing the claim for which the trial court granted declaratory judgment in 1776's favor. We

remand this cause for a determination of whether 1776 was entitled to an award of attorney's fees on the parties' remaining UDJA claims. We affirm the remainder of the trial court's judgment.

Beth Watkins, Justice